**HOMER ELECTRIC ASSOCIATION, INC., Appellant,**

v.

**STATE of Alaska, ALASKA PUBLIC UTILITIES COMMISSION, Appellee.**

No. S–1952.

Supreme Court of Alaska.

May 20, 1988.

C.R. Baldwin, Kenai, for appellant.

Virginia A. Rusch, Asst. Atty. Gen., Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Roger R. Kemppel, Donald C. Ellis, Kemppel, Huffman and Ginder, P.C., An-

chorage, for amicus curiae, Alaska Rural Elec. Co-op. Ass'n, Inc.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

Homer Electric Association, Inc. seeks reversal of certain orders issued by the Alaska Public Utilities Commission (APUC) in connection with Homer Electric's rate increase request. Specifically, Homer Electric claims that the APUC abused its discretion in excluding lobbying expenses from Homer Electric's allowable "revenue requirement,"[1] and in allocating to Homer Electric disproportionate and/or impermissible portions of the costs incurred in connection with the rate making proceeding.

## I. BACKGROUND

The material facts are undisputed. Homer Electric is a nonprofit cooperative corporation furnishing electricity to customers in Homer, Kenai, and Soldotna, Alaska. Homer Electric pays annual dues to the Alaska Rural Electric Cooperative Association, Inc., a nonprofit cooperative corporation whose stated purpose is "to promote and encourage cooperation among Alaska electric utilities in effecting goals and programs of mutual benefit." At least some of the money paid as dues to Alaska Rural is used by the organization to fund lobbying activities carried out on its members' behalf.

On April 4, 1984, Homer Electric filed certain tariff revisions, requesting APUC approval for an electrical rate increase. After an investigation and audit of Homer Electric's submitted materials, the APUC issued an order agreeing to stipulate to the rate increase, subject to certain conditions. One such condition was that 50% of the dues paid to Alaska Rural by Homer Electric be excluded from Homer Electric's revenue requirement as impermissible lobbying expenses.[2] The practical effect of this exclusion is to reduce by $14,761 Homer Electric's recognized operating costs for the test year under review, thus reducing the amount of the increase which Homer Electric will be allowed to pass on to its customers.

Following the hearing and order on Homer Electric's rate request, the APUC issued an order allocating costs for the proceeding pursuant to AS 42.05.651(a).[3] The APUC allocated to Homer Electric 100% of the "costs directly assignable to [the] proceeding," which in this case amounted to $872.41. Included among these costs was $482.06 in attorney's fees attributable to services rendered by an assistant attorney general in connection with the proceeding.

Homer Electric filed objections to both the APUC's exclusion of lobbying expenses and its allocation of costs. The APUC declined to reconsider its prior orders on the

---

1. Neither party has provided us with a precise definition of the term "revenue requirement." In this context, however, it appears undisputed that the term refers to those utility company expenditures which the APUC will recognize as legitimate costs for rate making purposes.

2. It appears that the APUC chose this percentage arbitrarily, in the absence of any documentation by Homer Electric or Alaska Rural as to what portion of the dues were actually used for lobbying activities. The Commission offered Homer Electric the opportunity to show, without arguing the merits of the exclusion, that less than 50% of the dues actually went to lobbying efforts. Homer Electric did not make such a showing, but has instead appealed the exclusion issue on its merits.

3. AS 42.05.651(a) provides:

After completion of a hearing or investigation held under this chapter, the commission shall allocate the costs of the hearing or investigation among the parties, including the commission, as is just under the circumstances. In allocating costs, the commission may consider the results, ability to pay, evidence of good faith, other relevant factors and mitigating circumstances. The costs allocated may include the costs of any time devoted to the investigation or hearing by hired consultants, whether or not the consultants appear as witnesses or participants. The costs allocated may also include any out-of-pocket expenses incurred by the commission in the particular proceeding. The commission shall provide an opportunity for any person objecting to an allocation to be heard before the allocation becomes final.

merits and Homer Electric, joined by Alaska Rural as amicus curiae on the lobbying expense issue, appealed the matter to the superior court. Homer Electric argued on appeal that (1) the APUC erred in excluding lobbying expenses from Homer Electric's revenue requirement, (2) the APUC erred in including as costs those attorney's fees attributable to services performed by the Attorney General's office and, (3) the APUC abused its discretion in allocating to Homer Electric 100% of the costs incurred by the APUC in the rate making proceeding. The superior court affirmed the APUC on all substantive issues, but remanded the case for a determination of the specific proportion of Alaska Rural dues actually used for lobbying purposes. Homer Electric appeals the superior court's ruling.

## II. EXCLUSION OF LOBBYING EXPENSES

■ The APUC's decision to exclude lobbying expenses in the case at bar was based upon its conclusion that, "as a matter of law and public policy," lobbying expenses should be excluded from public utilities' revenue requirements.[4] We must decide whether such a policy decision was within the APUC's legitimate statutory authority and, if so, whether there was a reasonable basis for its application in the case at bar.

The APUC's general powers and duties are defined in AS 42.05.141. That statute provides in part:

(a) The Alaska Public Utilities Commission may

. . . .

(3) *make or require just, fair and reasonable rates,* classifications, regula-

tions, practices, services and facilities for a public utility[.]

(Emphasis added). In addition AS 42.05.-381(a) provides in part:

All rates demanded or received by a public utility, or by any two or more public utilities jointly, for a service furnished or to be furnished *shall be just and reasonable;* however, a rate may not include an allowance for costs of political contributions, or public relations. . . .

(Emphasis added).

The APUC asserts that it has been given ample authority under these provisions to exclude any operating costs, including lobbying expenses, from a utility's revenue requirement when it concludes that inclusion of such costs is contrary to the best interests of the utility's ratepayers. Alaska Rural, appearing as amicus on behalf of Homer Electric,[5] argues that both the wording and legislative history of AS 42.-05.381(a) preclude the APUC from excluding lobbying expenses from a utility's revenue requirement.

Alaska Rural's argument is primarily one of legislative intent. As originally enacted, AS 42.05.381(a) provided only that public utility rates be "just and reasonable," as determined by the APUC under its general rate making authority. Ch. 113, § 6, SLA 1970. The statute was amended in 1976, however, to specify certain expenditures which the APUC was *required* to omit from a utility's allowable costs. Ch. 86, § 1, SLA 1976. As originally proposed, the 1976 amendment would have specifically excluded lobbying costs, as well as costs in connection with advertising, political and charitable contributions, and public relations.[6] The bill was amended on the floor, however, to delete the prohibitions on lob-

---

4. The APUC's decision in this case was based upon its earlier decision on the same question in *In re Chugach Electric Ass'n,* APUC Order No. U–81–53(21)/U–83–57(9)/U–84–13(1) (1984).

5. Homer Electric adopts Alaska Rural's argument on this issue *in toto.*

6. The amendment, as originally proposed, read:
   All rates demanded or received by a public utility, or by any two or more public utilities

jointly, for a service furnished or to be furnished shall be just and reasonable; *however, no rate may include an allowance for costs of advertising, political or charitable contributions, lobbying expenses, or public relations. . . .*
H.C.S.S.B. 50, 10th Leg., 1st Sess. (May 14, 1977) (emphasis added). These exclusions were made subject to certain exceptions not relevant here. *Id.*

bying expenses, advertising and charitable contributions.[7]

Alaska Rural argues that the legislature's deletion of the term "lobbying expenses" from the list amounts to a legislative determination, not only that lobbying expenses need not be excluded, but also that they may not be excluded from a utility's revenue requirement. In support of its argument, Alaska Rural points to the statements of Representative Freeman, a sponsor of the amendment to remove "lobbying expenses" from the list, who argued during debate on the measure:

Mr. Speaker ... I am basing my objection on personal experience.... [A]dvertising, ... lobbying expenses, [and] charitable contributions ... these are the sort of things that—especially the lobbying and advertising—are just part of doing business. For instance, if a utility sends a man down here to—in connection with a bill such as this, that's lobbying, and I just see no reason why you should ... a public utility especially has to come up with money to do business somewhere and this is just part of doing business. And I see nothing to be gained by putting these kinds of restrictions on a utility.

Record of the House Floor Debate on H.C. S.S.B. 50 (May 20, 1977). Alaska Rural concludes, based upon the foregoing, that the history of AS 42.05.381(a) evidences a clear legislative intent to *allow* lobbying expenditures as part of a utility's revenue requirement. We do not agree.

The mandatory exclusion provisions of AS 45.05.381(a) simply specify certain items which the APUC *must* exclude from a utility's revenue requirement. They say nothing whatsoever about what the APUC *may* exclude under its general authority to establish "just, fair and reasonable rates." AS 42.05.141(a)(3). The legislative history upon which Alaska Rural relies suggests at most that the legislature did not intend to eliminate the APUC's discretion to allow lobbying expenses if it saw fit to do so. Even Representative Freeman's comments, however, do not suggest an intent to pro-

hibit the exclusion of such expenses where the APUC, in its discretion, determines that exclusion is appropriate.

■ Having found no express or implied statutory prohibition on the APUC's ruling, we should reverse only if we find that the APUC had no reasonable basis for concluding that it was not "just, fair and reasonable" for public utilities to charge ratepayers for lobbying activities carried out on the utilities' behalf. *See Alaska Public Utilities Comm'n v. Greater Anchorage Area Borough*, 534 P.2d 549, 559 (Alaska 1975) (APUC rate making decisions generally subject to "reasonable basis" test); *Kelly v. Zamarello*, 486 P.2d 906, 917 (Alaska 1971) (reasonable basis test should be applied in cases "concerning administrative expertise as to either complex subject matter or fundamental policy formulations").

■ In reaching its decision on the lobbying expense issue in this case, the APUC relied upon several of its earlier decisions excluding lobbying expenses. *See In re Chugach Electric Ass'n*, APUC Order No. U–81–53 (21)/U–83–57(9)/U–84–13(1) (1984); *In re Enstar Natural Gas*, APUC Order No. U–81–101 (1982); *In re RCA Alaska Communications*, APUC Order No. U–78–4(33) (1981). In those cases, the APUC noted that utility companies, in charging their customers for lobbying activities, are "presuming to determine without the prior knowledge or consent of [their] ratepayers what pending legislation is or is not beneficial to them." *In re Enstar Natural Gas*, U–81–101 at 3. It also noted that the practice of forcing ratepayers, by virtue of the utility's monopoly status, to subsidize political activities with which they may not agree, has been rejected by numerous other jurisdictions. *See In re RCA Alaska Communications*, U–78–4(33) at 95–96; *see also In re Public Service Co. of Colorado*, 13 P.U.R.4th 40, 58 (Colo.Pub.Util.Comm'n 1975); *In re Washington Water Power Co.*, 24 P.U.R.4th 39, 50 (Idaho Pub.Util.Comm'n 1978); *Washington Utilities and Transportation*

---

7. *See* H.C.S.S.B. 50, am H, 10th Leg., 1st Sess.

(May 18, 1977).

*Comm'n v. Pacific Northwest Bell Telephone*, 26 P.U.R.4th 495, 514 (Wash.Util. & Trans.Comm'n 1978). *See generally In re Southwestern Bell Telephone*, 19 P.U. R.4th 1, 27–28 (Kansas State Corp. Comm'n 1977) (citing additional authorities). In accordance with these considerations, the APUC concluded that lobbying expenses were more appropriately borne by investors than by ratepayers, and that such activities should be financed out of profits rather than out of general operating costs.

We believe that the APUC's decision represents a logical solution to a difficult policy problem, and one which is consistent with the general regulatory trend in this arena.[8] We cannot say that it was without any reasonable basis. Nor can we say that it was unreasonable for the APUC to opt for a *per se* rule concerning the exclusion of lobbying expenses, rather than a case by case approach based upon the individual merits of each lobbying effort. The latter approach was explicitly abandoned by the APUC as unworkable because it required the Commission to make such "subjective and judgmental" decisions as:

> Is the Legislature (or Congress) acting wisely in changing existing laws? What types of proposed legislation should be defeated? Should a utility be reimbursed for meritorious but unsuccessful lobbying efforts? How should legislation beneficial to one utility's ratepayers but detrimental to others be treated?

*In re Enstar Natural Gas*, APUC Order No. U–81–101 at 3–4 (1982). We agree

with the APUC that it would be untenable to force that body into a position of having to choose between "good" lobbying and "bad" lobbying for purposes of establishing a utility's proper revenue requirements. Thus, we hold that the APUC acted reasonably and within its statutory authority in excluding such expenses altogether.[9]

### III. ATTORNEY GENERAL'S SERVICES AS AN ELEMENT OF COSTS

Alaska Statute 42.05.651(a) grants the APUC the authority to allocate among the parties, including the Commission itself, the costs incurred by the APUC in connection with certain rate making proceedings. In this case, the APUC concluded that the fees which it was required to pay to the Attorney General's office for the use of an assistant attorney general were allocable costs within the meaning of AS 42.05.651(a).[10] Accordingly, it assessed $482.06 in attorney's fees against Homer Electric, as part of its cost allocation order. Homer Electric contests the allocation, arguing that the term "costs," as used in AS 42.05.651(a), does not include attorney's fees, and that, even if it did, it would not include fees paid to assistant attorneys general who are statutorily designated as legal counsel to the Commission. *See* AS 42.05.111.

The APUC concluded, and the superior court agreed, that our holding in *Amerada Hess Pipeline Corp. v. Alaska Public Utilities Comm'n*, 711 P.2d 1170 (Alaska 1986), controls this issue. In *Amerada Hess*, we

---

**8.** In fact, at least one court has held that it may be unconstitutional to force ratepayers to subsidize political or religious activities with which they do not agree. *Cahill v. Public Service Comm'n*, 69 N.Y.2d 265, 513 N.Y.S.2d 656, 657, 506 N.E.2d 187, 188–89 (N.Y. 1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 100, 98 L.Ed.2d 61 (1987) (plaintiff stated cause of action for violation of First Amendment rights based on Public Service Commission practice of including charitable contributions as part of a utility's authorized expenditures).

**9.** Neither the APUC nor Homer Electric has contested that portion of the superior court's decision which required remand for a determination of the specific percentage of Alaska Rural dues attributable to lobbying expenses. We

agree with the trial court's conclusion that the arbitrary 50% figure was unsupported by the evidence, and we affirm the lower court's decision as to this limited remand.

**10.** The State Attorney General is designated by statute as staff counsel for the Commission. AS 42.05.111. However, the two assistant attorneys general assigned to the APUC are in fact paid for through "reimbursable services agreements," under which the Commission pays the Attorney General's office some $120,000 per year in exchange for its services. Of this figure, the Commission estimates that 46% (or $55,000) of the services provided by these assistant attorneys general is attributable to hearings and investigations for which the Commission may recover costs under AS 42.05.651.

held that the term "costs," as used in AS 42.06.610, includes fees paid to temporary private counsel retained on a contract basis by the APUC in connection with proceedings under the Pipeline Act. We stated:

> We ... reject the owners' contention that AS 42.06.610 does not authorize the allocation of attorney's fees. Pursuant to AS 42.06.610, the Commission is authorized to allocate the "costs" of the proceeding. The statute provides that "costs" include consultants' fees, but it nowhere excludes attorney's fees. When the legislature uses the term costs, it often intends to include attorney's fees. *See, e.g.,* AS 09.60.010. The inclusion of attorney's fees in the "costs" allocable in AS 42.06.610 is consistent both with the apparent intent of the legislature to allow the APUC to recoup its costs of regulation, and with AS 42.05.141(1) which provides that the powers of the APUC shall be liberally construed to accomplish its stated purposes. Thus, we hold that AS 42.06.610 authorizes the APUC to allocate the costs incurred in hiring temporary legal counsel for a particular proceeding.

*Id.* at 1182 (footnote omitted). The APUC points to the similarity in wording between AS 42.06.610 [11] and AS 42.05.651(a), [12] and argues that there is no reasoned basis upon which *Amerada Hess* can be distinguished from the case at bar. It concludes, therefore, that attorney's fees, including those attributable to the services of the Attorney General, are clearly allocable under the statute.

We agree with the APUC that the *Amerada Hess* rationale is applicable in the context of cost allocations under AS 42.05.651(a). Contrary to the APUC's assertion, however, that decision does not justify the cost allocation order entered here. *Amerada Hess* was expressly limited to cost allocations with regard to privately contracted "temporary legal counsel." 711 P.2d at 1181–82. That decision does not suggest that the APUC is entitled to be reimbursed for the cost of services rendered by the Attorney General's office pursuant to its statutory duty under AS 42.05.111, [13] nor do we think that such general overhead expenditures can be reasonably justified as an element of "costs" under AS 42.05.651(a).

Alaska Statute 42.05.651(a) provides that the APUC is entitled to allocate "costs ... includ[ing] the costs of any time devoted to investigation or hearing by *hired consultants* ... [and] any *out-of-pocket expenses* incurred by the commission in the particular proceeding." (emphasis added). Under traditional principles of *ejusdem generis,* we must limit the application of the general term "costs" to those expenses which are similar in nature to the more specific terms, "hired consultants" and "out-of-pocket expenses." *See* 2A N. Singer, Sutherland Statutory Construction § 47.17 (Sands 4th ed. 1984). Accordingly, while it may be appropriate to allow recovery of the state's expenses with regard to privately contracted outside counsel, [14] we do not

---

11. AS 42.06.610(a) provides:

During a proceeding held under this chapter, the commission shall allocate the cost of the proceeding among the parties, including the commission, as is just under the circumstances. The costs allocated may include the costs of any time devoted to investigations or hearings by *hired consultants,* whether or not the consultants appear as witnesses or participants. The commission shall provide an opportunity for any person objecting to an allocation to be heard before the allocation becomes final.

12. *See supra* note 3.

13. AS 42.05.111 provides:

(a) The attorney general is legal counsel for the commission. The attorney general shall advise the commission in legal matters arising in the discharge of *its duties and represent the* commission in actions to which it is a party. If, in the opinion of the commission, the public interest is not adequately represented by counsel in a proceeding, the attorney general, upon request of the commission, shall represent the public interest.

(b) The commission may employ temporary legal counsel from time to time in proceedings before the commission in which the attorney general is representing the public interest or a party before the commission.

14. We note that the use of temporary legal counsel is expressly limited by the terms of AS 42.05.111(b) to those situations in which the Attorney General is representing the public interest or a party before the commission.

think it proper, under this statutory scheme, to permit recovery for routine services rendered by officers of the state pursuant to an explicit statutory mandate.

Under the broad reading suggested by the APUC, we can conceive of no state expense incurred in connection with APUC rate making proceedings which would fall outside the scope of the term "costs" under AS 42.05.651(a). In our view, the term "costs" was never intended to be so broadly construed. Thus, we hold that the APUC erred in allocating as part of its costs those fees attributable to services performed by the Attorney General's office in connection with this proceeding.

## IV. 100% COST ALLOCATION TO HOMER ELECTRIC

■ Alaska Statute 42.05.651(a) allows the APUC to allocate the costs of rate making proceedings "among the parties, including the commission, as is just under the circumstances." In determining whether an allocation is "just under the circumstances," the Commission may consider "the results, ability to pay, evidence of good faith, other relevant factors and mitigating circumstances." AS 42.05.651(a).

In the case at bar, Homer Electric and the APUC were the only parties. The APUC allocated 100% of the costs of the proceeding to Homer Electric. The primary justifications offered by the Commission in support of this result were (1) that Homer Electric had a greater ability to pay because Homer Electric could pass the costs on to its ratepayers, while the APUC "must function under budgetary limitations," and (2) that, in fairness, "the cost-causer should be the cost-payer," and Homer Electric created these costs by filing its tariff revisions. We agree with Homer Electric that such considerations, by themselves,[15] are insufficient to justify the allocation in this case.

In *Amerada Hess*, 711 P.2d at 1180, we upheld the cost allocation scheme established under the Pipeline Act against a constitutional challenge claiming that the statute violated due process by allowing the Commission to be a "judge in its own cause" as to liability for costs. We stated:

We conclude that the dual role of the APUC as both administrator of its own budget and adjudicator of costs does not violate state due process if sufficient safeguards exist against APUC's discretion. In this case, the APUC's issuance of a reasoned decision explaining its cost allocation was sufficient safeguard against the APUC's abuse of discretion. *We can adequately check the APUC's exercise of discretion by reviewing a decision setting forth the agency's factual premises and substantive considerations.*

*Id.* (emphasis added). We believe that this is an appropriate case in which to act as a check on the APUC's discretion.

We do not question the APUC's general authority to determine the appropriate proportion of the costs to be borne by each party in a rate making proceeding. However, we are disturbed by the reasoning of the APUC in this case. The factors upon which the APUC order is based, *i.e.*, that Homer Electric can better pass along its costs and that Homer Electric "caused" the costs in this proceeding by requesting the rate increase, would appear to be present in virtually every case. Indeed, the APUC's arguments suggest that it may be the Commission's regular policy that utility companies bear all costs in rate making proceedings. Such a policy is contrary to the clear wording of AS 42.05.651(a), which allows the Commission to allocate costs among the parties *"including the commission."* To allow the APUC to base its findings as to its own liability upon such superficial and recurring grounds would be tantamount to interpreting the statute to

---

15. The Commission also noted that "Homer Electric was spared the expense of a full evidentiary hearing." However, this consideration is essentially neutral in character; the Commission was equally "spared" such costs. Moreover, AS 42.05.651(a) provides that costs should be allocated among the parties as is "just," whether they are incurred in hearings or investigations. Thus, the fact that this matter did not go to a "full evidentiary hearing" is not controlling.

read that "the commission may allocate costs among the parties *excluding the commission.*" We think this is inconsistent with the legislature's intent. Consequently, we reverse the APUC's cost allocation and remand for further findings as to the propriety of a 100% cost allocation in the case at bar.[16]

## V. CONCLUSION

The APUC rate-setting order, insofar as it relates to the exclusion of lobbying expenses from Homer Electric's revenue requirement, is AFFIRMED. In accordance with the trial court's earlier order, however, we REMAND to the superior court with instructions to REMAND the matter to the APUC for a determination of the specific portion of Alaska Rural dues actually used for lobbying activities.

The APUC cost allocation order is REVERSED and the matter is REMANDED to the superior court with instructions to REMAND to the APUC with instructions that the APUC (1) exclude from its cost allocation any fees attributable to services performed by the Attorney General's office in connection with this proceeding, and (2) make further findings as to the propriety of a 100% cost allocation order in this case.

MATTHEWS, Chief Justice, dissenting in part.

I agree with the opinion, except as to part IV concerning the 100% cost allocation to Homer Electric.

APUC gave three reasons in support of this allocation:

1. ability to pay, finding that Homer Electric had the superior ability since it could pass the costs on to the consumer;

2. "that insofar as possible the cost causer should be the cost payer; i.e. HEA was the party whose tariff revision generated the audit and associated costs in this proceeding and should be required to bear the burden of paying those costs."; and

3. that "HEA was spared the expense of a full evidentiary hearing in this proceeding."

The expression of the third reason suggests that if the Commission had subjected the utility to a full evidentiary hearing and was thus responsible for needless additional work, the Commission would not have made the 100% allocation.

It seems to me that all of these reasons are appropriate for consideration and that the Commission has expressed grounds which suffice to satisfy the "just under the circumstances" statutory standard. I would therefore affirm the cost allocation.

---

**16.** We do not mean to suggest that the 100% cost allocation is necessarily unjustified. Our holding is simply that it is an abuse of discretion for the APUC to enter such an order without a more individualized consideration of the facts of the particular case.