COOK INLET PIPE LINE
COMPANY, Appellant,

v.

THE ALASKA PUBLIC UTILITIES
COMMISSION, and Tesoro Alaska
Petroleum Company, Appellees.

No. S–4144.

Supreme Court of Alaska.

June 26, 1992.

Rehearing Denied July 17, 1992.

George Trefry, Perkins Coie, Anchorage, for appellant.

Glenn M. Gustafson, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for appellee, The Alaska Public Utilities Com'n.

Robin O. Brena, Law Offices of Robin O. Brena, Inc., Anchorage, for appellee Tesoro Alaska Petroleum Co.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This appeal arises out of Cook Inlet Pipe Line Company's (CIPL) challenges to *intrastate* crude oil transportation tariffs ordered by the Alaska Public Utilities Commission (APUC) under the authority of Alaska's Pipeline Act. At the foundation of the dispute is the APUC's use of an "original cost method" for reviewing intrastate tariffs. CIPL notes that the Federal Energy Regulatory Commission (FERC), which regulates *interstate* tariffs, used a different rate setting method for the relevant time period. According to CIPL, use of these different methods resulted in intrastate tariff rates established by the APUC which were substantially below the interstate tariffs approved by the FERC.

CIPL contends that the APUC tariff orders are preempted by federal law. CIPL also argues that the APUC's tariff setting methodology results in an unconstitutional taking of property and that the lower intrastate tariffs result in unjust discrimination in violation of the federal commerce clause. Additionally, CIPL maintains that the APUC abused its discretion in making several factual determinations. Finally, CIPL challenges the superior court's award of costs and attorney's fees. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A clear understanding of the facts and the arguments of the parties in this case is possible only in conjunction with an understanding of the historical development of the methods government agencies have used to regulate utilities. This historical development is summarized in *Farmers Union Central Exchange v. Federal Energy Regulatory Commission,* (*Farmers Union I*) 584 F.2d 408, 412–17 (D.C.Cir. 1978), *cert. denied,* 439 U.S. 995, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978), *rev'd after remand,* 734 F.2d 1486 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1988).

In its early regulation of railroads, the Interstate Commerce Commission (ICC) utilized a "fair value" ratemaking method. *See Smyth v. Ames,* 169 U.S. 466, 546, 18 S.Ct. 418, 434, 42 L.Ed. 819 (1898). In the early 20th century, the United States Supreme Court approved the use of the fair value method for ratemaking in other public utility contexts. *See e.g., Willcox v. Consolidated Gas Co. of New York,* 212 U.S. 19, 50, 29 S.Ct. 192, 199, 53 L.Ed. 382 (1909). However, the fair value method lost favor after Justice Brandeis criticized it in *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission of Missouri,* 262 U.S. 276, 289–312, 43 S.Ct. 544, 547–48, 67 L.Ed. 981 (1923) (Brandeis, J. concurring). Setting a just rate of return for a regulated utility under

the "fair value" method required a determination of the reasonable value, at the time of ratemaking, of property dedicated to public use. *Id.* at 287, 43 S.Ct. at 546; *Willcox,* 212 U.S. at 50, 29 S.Ct. at 199. After a careful analysis of the "fair value" method, Justice Brandeis declared:

> The result, inherent in the rule itself, is arbitrary action on the part of the rate-regulating body. For the rule not only fails to furnish any applicable standard of judgment, but directs consideration of so many elements that almost any result may be justified.

*Missouri ex rel. Southwestern Bell,* 262 U.S. at 296–98, 43 S.Ct. at 549–50.

As an alternative to the "fair value" approach, Brandeis recommended that rates be determined based on the amount of "capital prudently invested in the utility." *Id.* at 310, 43 S.Ct. at 554. Some regulatory agencies, including the Federal Power Commission, implemented this suggested change and in 1944 the United States Supreme Court approved this "prudent investment" or what has become known as an "original cost" ratemaking method in *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 603–06, 64 S.Ct. 281, 288–89, 88 L.Ed. 333 (1944).

The ICC abandoned the "fair value" ratemaking method and adopted an "original cost" method for railroads. *See Increased Freight Rates, 1951,* 284 I.C.C. 589, 607–08 (1952). However, it retained a "fair value" approach in oil pipeline rate regulation. *Petroleum Products, Williams Bros. Pipe Line Co.,* 355 I.C.C. 479, 481 (1976).

In *Farmers Union I,* the United States Court of Appeals for the District of Columbia Circuit directed the newly formed Federal Energy Regulatory Commission (FERC)[1] to reconsider the ICC's use of the valuation ratemaking method in reviewing oil pipeline tariffs. 584 F.2d at 422. The court stated:

> In sum, we are not persuaded by the Commission's conclusion that "consistency and fairness" dictate resurrection of

---

1. Responsibility for regulation of interstate oil pipeline rates was transferred from the ICC to the FERC pursuant to the Department of Energy Organization Act, Pub.L. No. 95–91, § 402(b), 91 Stat. 584 (1977).

the "fair value" method last used thirty years ago. To the extent that the method was wrongly grounded in the law at that time, it is no better off now. To the extent that it may have been rightly grounded in the economics of that day, the ICC has provided us with no reason to believe that three decades have not changed the situation.

*Id.* at 418–19 (citation omitted).

When the FERC adopted a fair value methodology on remand, the court concluded the FERC's decision lacked a reasoned basis because it failed to adequately consider alternative methods and remanded the case again with directions that the FERC reconsider again its ratemaking method. *Farmers Union Cent. Exch. v. Fed. Energy Regulatory Comm'n,* (*Farmers Union II*), 734 F.2d 1486, 1520, 1530 (D.C.Cir. 1984), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984). The court noted that "the original cost methodology, a proven alternative, enjoys advantages that should not be underestimated." *Id.* at 1530.

Further, the court called into question one of the FERC's justifications for continued use of a fair value ratemaking method. This justification was that an adoption of an original cost method would require the costly construction of "transitional" rate bases. *Id.* at 1517. The court stated:

> FERC failed to give a reasoned basis for its assumption that "[t]ransitional rate bases would have to be constructed" at all. Regulated industries have no vested interest in any particular method of rate base calculation. *See FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942). Accordingly, as FERC acknowledged, a switch to a new rate base formula would not disrupt protected pipeline property. So long as the resulting rates are reasonable, the oil pipeline companies should have no difficulty maintaining their financial integrity. We are therefore at a loss to understand FERC's trepidation about a change in its regulatory method.

*Id.* at 1517–18.

On remand, in a decision commonly known as Opinion No. 154–B, the FERC concluded that an original cost ratemaking methodology should be adopted. *Williams Pipe Line Co.,* 31 FERC ¶ 61,377 (1985). However, it also adopted a "starting or transition rate base" for existing pipeline assets. *Id.* at ¶ 61,835. The FERC explained:

> [T]he Commission is concerned about the long reliance of pipeline investors on the previous rate base method and, as a result, has sought a middle ground that is fair in light of investor expectations but without perpetuating the serious flaws of the previous method.... The Commission believes [the transition rate base] formula, which is a middle ground between valuation and net depreciated original cost, is fair in view of pipeline investor reliance on a rate base which has been adjusted for inflation.

*Id.* at ¶ 61,836.

FERC's Opinion No. 154–B has not been judicially reviewed.

During this period of fundamental change in regulatory ratemaking methods, the Cook Inlet Pipe Line System (pipeline) was developed. The pipeline was built in 1967 to transport crude oil from several offshore oil fields in Cook Inlet. The twenty-inch pipeline is over forty miles in length and extends from Granite Point to an offshore tanker loading platform near Drift River.

The owners of the pipeline contributed $4 million in equity by purchasing stock. In order to obtain financing to construct the pipeline, a throughput agreement was assigned to a lender to secure a $36 million five-year loan. The owners' original plan was to convert the financing to a thirty-year term. However, in 1970 the owners adopted a policy of forgoing dividends in order to pay off debt because of decreased oil reserve estimates. The debt was retired in 1979.

At the time operations commenced, CIPL became subject to federal regulation as a common carrier engaged in interstate commerce. The interstate tariffs CIPL established for oil transportation were subject to

FERC review and approval. *See Cook Inlet Pipe Line Co.*, 38 FERC ¶ 61,083 (1987) (FERC Approval of Settlement).

CIPL filed interstate tariffs of $0.58 per barrel for 1981 and $0.915 per barrel for 1982. Concerns of the State of Alaska regarding these tariffs were resolved in an agreement with CIPL. Thereafter, the FERC approved the tariffs as part of an uncontested settlement. *Id.*

CIPL concedes that because of intrastate crude oil deliveries which began in 1976, CIPL became subject to state regulation by the Alaska Pipeline Commission (APC) under the authority of the Alaska Pipeline Commission Act of 1972. Ch. 139, § 1, SLA 1972 (amended 1976, 1977). Over the next several years, CIPL gradually increased its intrastate tariffs.

The present dispute arose when CIPL increased its intrastate tariff from $0.38 to $0.58 per barrel effective January 1, 1981. Twelve cents of the increase were included to pay for the future dismantling and restoration (D & R) of CIPL's facilities. Eight cents of the increase were included because of increased operating costs and reduced crude oil production. In December 1980 the APC suspended the $0.58 per barrel tariff and ordered an investigation, designated Docket No. P–80–5, to determine whether the tariff was just and reasonable. However, the APC permitted CIPL to collect the $0.58 tariff subject to refund.

In July 1981 the APUC assumed responsibility for state regulation of intrastate pipeline tariffs and for the resolution of Docket No. P–80–5.[2] Before Docket No. P–80–5 was resolved, CIPL filed a new intrastate tariff of $0.915 effective January 15, 1982. The D & R charge remained at twelve cents per barrel. In Docket No. P–82–1, the APUC suspended the new tariff and set a temporary tariff of $0.38, which was equal to the last rate approved by the APC. As before, CIPL was permitted to collect the new tariff subject to refund. In April 1982 the APUC consolidated the two pending dockets.

In January 1985 after conducting a hearing and receiving briefs and other materials, the APUC entered an Order Prescribing Regulatory Methodology and Directing CIPL to File Revised Revenue Requirements (Methodology Order). In the Methodology Order, the APUC rejected CIPL's arguments that a "transition rate base" was necessary to ensure just and reasonable rates and adopted a rate base "computed by taking the original cost of the pipeline minus accumulated depreciation on a straight line basis as if the pipeline had been regulated on original cost from the beginning."

In January 1987 the APUC entered an Order (Tariff Order) approving intrastate tariffs for 1981 and 1982 of $0.49 and $0.59 per barrel respectively, exclusive of D & R charges. These approved rates differed from the tariffs CIPL filed in 1981 and 1982 of $0.46 and $0.795 respectively, exclusive of D & R charges. In the Tariff Order, the APUC required CIPL to refund the excess amount it collected from intrastate commerce in 1982.

In March 1987 CIPL moved for reconsideration of the Methodology Order and the Tariff Order in light of the FERC's Opinion No. 154–B, which had established a transition rate base. When the APUC denied CIPL's motion CIPL appealed to the superior court.

While this appeal was proceeding, CIPL requested that the FERC declare that the intrastate tariffs set by the APUC violated sections 2 and 3(1) of the Interstate Commerce Act.[3] CIPL eventually dropped its allegations with respect to section 3(1). *Cook Inlet Pipe Line Co.*, 47 FERC ¶ 61,-057 at 61,172 (1989). The FERC ultimately determined that it had no power to alter intrastate rates under section 2. *Cook In-*

---

2. In 1981 the responsibilities for intrastate oil pipeline regulation was transferred from the APC to the APUC and the Alaska Pipeline Commission Act was renamed the Pipeline Act. Ch. 110, §§ 1, 9, SLA 1981. The Pipeline Act is presently codified at AS 42.06.140–640.

3. These statutory provisions appear at 49 U.S.C.A. §§ 2, 3 (1959). In 1978 Congress repealed the relevant parts of the Interstate Commerce Act except as it relates to transportation of oil by pipeline. 49 U.S.C.A.App. §§ 2, 3, 13(4) (West Supp.1991).

*let Pipe Line Co.*, 47 FERC ¶ 61,393 at 62,306 (1989). Further, it stated that it did not "intend to suggest that the ICA requires absolute rate parity either for rates for similar interstate services or between rates for similar intra/interstate services." *Id.*

Proceedings in the Alaska superior court culminated in July 1990 when Judge John Bosshard III affirmed the agency's Methodology Order and Tariff Order holding that the "APUC's authority to determine reasonable intrastate rates was not preempted by federal law; that APUC reasonably applied the original cost methodology for ratemaking; and that APUC set just and reasonable intrastate tariff rates for CIPL." CIPL appeals.

## II. STANDARD OF REVIEW

■ In an appeal from a judgment of a superior court acting as an intermediate court of appeal, we give no deference to the superior court decision. Rather, we independently review the agency decision. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

■ This case involves questions of constitutional law, federal preemption and the scope of administrative authority. These are questions of law within the special expertise of the courts. In reviewing questions of law which do not involve agency expertise, we will substitute our judgment for that of the administrative agency. *North Slope Borough v. LeResche*, 581 P.2d 1112, 1115 (Alaska 1978). As we substitute our judgment, it is our duty "to adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

■ However, we apply a reasonable basis standard of review to administrative determinations of complex issues involving agency expertise and specialized knowledge. *Kelly v. Zamarello*, 486 P.2d 906, 917 (Alaska 1971). The reasonable basis standard is especially appropriate where the legislature has delegated to the agency broad regulatory authority over an area in question. Therefore, it is the appropriate standard of review of the technical bases for APUC's establishment of a regulatory methodology and for its establishment of intrastate tariffs. *See Homer Elec. Ass'n v. Alaska Pub. Util. Comm'n*, 756 P.2d 874, 877 (Alaska 1988); *Glacier State Tel. Co. v. Alaska Pub. Util. Comm'n*, 724 P.2d 1187, 1190–92 (Alaska 1986). When applying the reasonable basis test, we give deference to the agency's determination "so long as it is reasonable, supported by the evidence in the record as a whole, and there is no abuse of discretion." *Kodiak Western Alaska Airlines, Inc. v. Bob Harris Flying Serv., Inc.*, 592 P.2d 1200, 1203 n. 7 (Alaska 1979).

■ Our review of the superior court's award of attorney fees is limited to a determination of whether the court abused its discretion. *Tesoro Alaska Petroleum*, 746 P.2d at 907.

## III. DISCUSSION

■ At the foundation of this case is a dispute about the extent of the APUC's power to set intrastate rates which differ from interstate rates approved by the FERC. We believe CIPL's theory of the case is flawed at this basic level and that CIPL mistakes the proper scope of the APUC's jurisdiction. Moreover, we believe CIPL mistakenly relies on the 1982 interstate rates approved by the FERC as a standard by which intrastate rates should be measured.[4]

---

**4.** After focusing on its three major legal arguments, CIPL briefly raises four technical issues which involve agency expertise. Based on our review of the record and the contested APUC orders we conclude that these objections are without merit. As noted above, we will defer to determinations involving agency expertise and specialized knowledge unless they are unreasonable or are unsupported by the record. *Kodiak Western Alaska Airlines*, 592 P.2d at 1203 n. 7.

CIPL contends that it was inappropriate for the APUC to impute a hypothetical capital structure of 25% debt and 75% equity for ratemaking purposes where no debt existed in CIPL's actual capital structure. We find no error in the APUC's use of this hypothetical capital struc-

The three legal issues CIPL presents are as follows: 1) whether the APUC's denial of a "transition rate base" constitutes an unconstitutional taking of property; 2) whether federal law preempts the APUC's Methodology and Tariff Orders; and 3) whether the Methodology and Tariff Orders create an undue burden on interstate commerce.

## A. Taking of Property.

■ CIPL contends that the APUC should have adopted a "transitional rate base" to avoid a taking of property in violation of the constitutions of the State of Alaska and the United States.[5] CIPL argues it has been treated in a manner which was characterized as unconstitutional in *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989).

According to CIPL a taking of property occurred in two alternative ways. First, CIPL argues that the APUC's original cost methodology results in higher rates in the early years of a pipeline and lower rates in later years. CIPL contends that the APUC's scheme creates "fictional intrastate shippers" which "plainly results in a taking of CIPL's property rights to the extent of the higher, earlier rates which the APUC has falsely deemed CIPL to have received." Second, CIPL argues that the APUC's scheme reduced "the 1981 rate base from the FERC valuation of $41,911,-500 to $17,996,000 ... [and reduced] the

1982 rate base from the FERC valuation of $43,359,200 to $17,996,000." CIPL contends this reduction of its rate base is a taking of property.

We are not persuaded by CIPL's first takings arguments because the arguments focus on the ratemaking method rather than the effect of the method on return on investment. CIPL apparently overlooked the nature of the proper inquiry which the United States Supreme Court identified in *Duquesne:*

> "It is not the theory, but the impact of the rate order which counts." *Hope*, 320 US, at 602, 88 L Ed 333, 64 S Ct 281 [288]. The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties.... The Constitution protects the utility from the net effect of the rate order on its property.

*Duquesne*, 488 U.S. at 314, 109 S.Ct. at 619 (1989).

Only one sentence out of CIPL's entire takings arguments addresses the economic effect of the APUC's regulatory scheme. CIPL complains that "the resulting 20.5¢ reduced tariff for 1982 will substantially reduce 1982 earnings for CIPL."

We have held that the State of Alaska may regulate industry in a manner which has a detrimental economic effect on a

---

ture. Even CIPL's expert indicated that, based on information available at the time the APUC was setting rates, some debt would have been appropriate in CIPL's capital structure.

Moreover, imputation of hypothetical capital structures is an established and widely used regulatory tool. "The practice of imputing a hypothetical amount of debt has been explicitly approved by the public utilities commissions or courts of at least twenty-two states and the District of Columbia." *Communications Satellite Corp. v. F.C.C.*, 611 F.2d 883, 903–09 (D.C.Cir. 1977) (approving a hypothetical 45% debt structure where the company's actual capital structure was 100% equity).

CIPL also contends that the APUC's rate of return determination was not supported by substantial evidence, that the APUC erred in its calculation of CIPL's "allowance for funds used during construction" and that there was no reasonable basis for the method CIPL was required to use in accounting for certain major repairs to

the pipeline. Our review of the record leaves us with the conclusion that the APUC's determinations in these areas are adequately supported by facts and have a reasonable basis in law.

5. Alaska's constitution protects private property as follows: "Private property shall not be taken or damaged for public use without just compensation." Alaska Const. art. I, § 18.

Under the constitution of the United States, "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

We have previously held that because of the inclusion of the term "damaged," the Alaska Constitution affords the property owner broader protection than that conferred by the Fifth Amendment. *DeLisio v. Alaska Superior Court*, 740 P.2d 437, 439 n. 3 (Alaska 1987). However, the difference between Alaska's takings clause and the federal clause is irrelevant to this case.

business without causing a taking of property which requires compensation. *Alaska, Dep't of Natural Resources v. Arctic Slope Regional Corp.*, 834 P.2d 134 (Alaska, 1991). We recognize that the APUC has broad limits within which it may exercise its regulatory ratemaking power without running afoul of constitutional protection of private property. *See Duquesne,* 488 U.S. at 316, 109 S.Ct. at 620 (rejecting the notion that any particular ratemaking method is constitutionally required). Even if the APUC's regulatory scheme has a detrimental effect on CIPL's earnings, CIPL has made no showing that the scheme threatens CIPL's financial integrity. *See Farmers Union II,* 734 F.2d at 1517–18. We conclude that the APUC's application of an original cost rate methodology without a transition rate base does not constitute an unconstitutional taking of CIPL's property. CIPL's second argument that the APUC took its property when it reduced CIPL's "rate base" is wholly without merit. The "rate base" is a theoretical construct from which rates are derived. It is not "property."

### B. *Federal Preemption.*

 CIPL contends that "it cannot comply with both the Tariff Order and section 2" of the Interstate Commerce Act (ICA).[6] CIPL contends that because of this conflict with federal law the Tariff Order is preempted. CIPL also argues that the APUC's "Tariff Order is preempted under the "filed rate doctrine" which requires the APUC to recognize FERC-approved rates." CIPL contends that this doctrine compels the APUC to set intrastate rates equal to the interstate rates approved by the FERC since the service is the same in either case.

The Alaska legislature delegated to the APUC the authority to prescribe or require

"just, fair and reasonable rates" for pipeline carriers operating in Alaska. AS 42.-06.140. Although the legislature recognized that federal regulators had jurisdiction over interstate commerce, the legislature intended to grant the APUC full power to regulate intrastate rates: "[n]othing limits the powers of the commission set out in this chapter except to the extent they are preempted by federal law." AS 42.06.-245.

This state legislation was enacted against a backdrop of well established federal law in the form of the ICA. The ICA was enacted to "secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like services under similar circumstances and conditions; [and] to prevent undue or unreasonable preferences to persons, corporations, or localities." *Interstate Commerce Comm'n v. Baltimore & Ohio R.R.,* 145 U.S. 263, 276, 12 S.Ct. 844, 848, 36 L.Ed. 699 (1892).

However, the United States Supreme Court has squarely held that as originally enacted the ICA was not intended to intrude on the power of the states to regulate intrastate commerce. *Simpson v. Shepard,* 230 U.S. 352, 418, 33 S.Ct. 729, 748, 57 L.Ed. 1511 (1913). In *Simpson,* the Court stated, "Congress carefully defined the scope of its regulation, and expressly provided that it was not to extend to purely intrastate traffic." *Id.*

> Congress did not undertake to say that the intrastate rates of interstate carriers should be reasonable, or to invest its administrative agency with authority to determine their reasonableness.... It cannot be supposed that Congress sought to accomplish by indirection that which it expressly disclaimed, or attempt-

---

**6.** Section 2 of the Interstate Commerce Act provides as follows:

> If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions

of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful.

49 U.S.C.A. § 2 (West 1959).

ed to override the accustomed authority of the states without the provision of a substitute. On the contrary, the fixing of reasonable rates for intrastate transportation was left where it had been found; that is, with the states and the agencies created by the states to deal with that subject.

*Id.* at 420–21, 33 S.Ct. at 749.

Section 2 was part of the original ICA of 1887. 49 U.S.C.A. § 2 (West 1959). Therefore, we conclude that when it interpreted Congress' intent regarding the regulation of intrastate rates in *Simpson,* the Court rejected the notion that section 2 applied to intrastate rates.[7] Because section 2 of the ICA was not intended to apply to intrastate rates, we reject CIPL's argument that section 2 requires the APUC to allow CIPL to set intrastate rates which match interstate rates.

Our conclusion does not ignore the power of Congress over intrastate rates where necessary to prevent unjust discrimination which creates an undue burden on interstate commerce. We recognize that in a provision of the Transportation Act of February 28, 1920, now codified at 49 U.S.C.A. § 13(4), Congress granted the ICC power to fix *intrastate* rates "after full hearing" which demonstrates that the intrastate rates result in "unjust discrimination against, or undue burden on, interstate or foreign commerce." 49 U.S.C.A. § 13(4) (West 1959).

CIPL expressly disclaims[8] an argument based on section 13(4). It relies only on section 2.[9]

### C. *The Commerce Clause.*

■ Invoking the "dormant commerce clause," CIPL contends that on its face, the APUC Tariff Order "discriminates against interstate commerce because it provides a different tariff if the person using the pipeline does not take the oil out of the state." It argues that this court has aggressively struck down regulations which "result in intrastate economic protectionism."

We find it unnecessary and improper to analyze CIPL's argument under a "dormant commerce clause" theory. While such an analysis may be proper in the absence of federal legislation, *Philadelphia v. New Jersey,* 437 U.S. 617, 623, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1972), it is unnecessary in the context of this case. In fact, the United States Supreme Court has declared that "a limitation [on state power over intrastate rates] may not be implied because of a dormant Federal power; that is, one which has not been exerted, but can only be found in the actual exercise of Federal control." *Simpson v. Shepard,* 230 U.S. 352, 417, 33 S.Ct. 729, 748, 57 L.Ed. 1511 (1913). In section 13(4) of the ICA Congress clearly provided for distinct roles of federal and state regulators and

---

7. CIPL also mentions section 3 of the ICA in it arguments. However, the United States Supreme Court has also considered and rejected an argument that section 3 was intended to impose federal control over intrastate rates. *Chicago, Milwaukee & St. Paul Ry. Co. v. State Pub. Util. Comm'n of Illinois,* 242 U.S. 333, 335–37, 37 S.Ct. 173, 174–75, 61 L.Ed. 341 (1917).

8. In its opening brief, CIPL notes that it "has not yet sought the Section 13(4) remedy. This remedy involves the FERC holding a hearing, making findings, and setting intrastate rates itself. CIPL has not sought this remedy, because the language of Section 2 is plain enough to obviate the need for FERC intervention."

As discussed above, section 2 of the ICA does not help CIPL. Its remedy, if it has one, must be sought in a section 13(4) proceeding before the FERC. We decline CIPL's invitation to remand this proceeding for further fact finding regarding prejudice to interstate carriers.

9. CIPL also contends that the interplay between Section 2 of the ICA and the "filed rate doctrine" works to preempt an intrastate rate which differs from a FERC-approved interstate rate.

This argument ignores Congress' careful preservation of the primary authority of states over intrastate rates. *See North Carolina v. United States,* 325 U.S. 507, 510–11, 65 S.Ct. 1260, 1263, 89 L.Ed. 1760 (1945). The filed rate doctrine requires states and their agencies to respect interstate rates set by the FERC, but does not require that interstate and intrastate rates be identical. *See, e.g., Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 966, 106 S.Ct. 2349, 2357, 90 L.Ed.2d 943 (1986) (holding that a state must allow FERC-approved wholesale power rates as a reasonable cost when setting retail power rates).

provided a remedy where intrastate rates are found to unjustly discriminate against interstate commerce. 49 U.S.C.A. § 13(4) (West 1959).

The United States Supreme Court interpreted the effect of § 13(4) as follows:

As to interstate regulation, the Commission is granted the broadest powers to prescribe rates and other transportation details. No such breadth of authority is granted to the Commission over purely intrastate rates. Neither § 13(4), nor any other congressional legislation, indicates a purpose to attempt wholly to deprive the states of their primary authority to regulate intra-state rates. Since the enactment of § 13(4), as before its enactment, a state's power over intrastate rates is exclusive up to the point where its action would bring about the prejudice or discrimination prohibited by that section. When this point—not always easy to mark—is reached, and not until then, can the Interstate Commerce Commission nullify a state-prescribed rate.

*North Carolina v. United States*, 325 U.S. 507, 510–11, 65 S.Ct. 1260, 1263, 89 L.Ed. 1760 (1945) (citations omitted).

The Court also emphasized that the ICC was powerless to interfere with a state-prescribed rate "unless there are clear findings, supported by evidence, of each element essential to the exercise of that power by the Commission." *Id.* at 511, 65 S.Ct. at 1263.

To our knowledge, there has never been a "full hearing" by any regulatory body which resulted in findings supporting a determination that the 1982 intrastate rates the APUC approved resulted in undue prejudice or unjust discrimination against interstate commerce. Therefore, we consider only whether the APUC's approval of an intrastate rate which was lower than the interstate rate, by itself, violates section 13(4) by causing "unjust discrimination against, or undue burden on, interstate ... commerce." 49 U.S.C.A. § 13(4) (West 1959).[10]

We conclude that CIPL's contentions are without merit. Indeed, the federal courts have consistently found that a disparity between interstate rates and intrastate rates does not, by itself, equate to unjust discrimination against interstate commerce. *North Carolina*, 325 U.S. at 512–14, 65 S.Ct. at 1263–64. Rather, a finding of unjust discrimination must rest on specific findings based on substantial evidence that demonstrates, inter alia, that the intrastate rates are "less than compensatory or insufficient to cover the full cost of service," *Id.* at 515, 65 S.Ct. at 1265, or that they "were abnormally low and failed to contribute a fair share of overall revenue." *Public Service Comm'n of Utah v. United States*,

---

**10.** The full text of section 13(4) is as follows:

Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against, or undue burden on, interstate or foreign commerce (which the Commission may find without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier, or group or groups of carriers wholly within any State), which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, discrimination, or burden: *Provided*, That upon the filing of any petition authorized by the provisions of paragraph (3) of this section to be filed by the carrier concerned, the Commission shall forthwith institute an investigation as aforesaid into the lawfulness of such rate, fare, charge, classification, regulation, or practice (whether or not theretofore considered by any State agency or authority and without regard to the pendency before any State agency or authority of any proceeding relating thereto) and shall give special expedition to the hearing and decision therein. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding.

49 U.S.C.A. § 13(4) (West 1959).

356 U.S. 421, 426, 78 S.Ct. 796, 799, 2 L.Ed.2d 886 (1958).

CIPL has not developed any such evidence in this proceeding which supports its claim that interstate shippers suffered unfair prejudice or were otherwise commercially disadvantaged. It chose not to pursue an action before the FERC based on section 13(4), which would have required it to present such evidence. Rather, CIPL contends that as a matter of law, discrimination against interstate commerce is present where approved intrastate rates are $0.20 per barrel less than interstate rates and the service provided is identical.

This argument rests on the unproven assumption that the interstate rates were "reasonable." Unlike CIPL's approved 1982 intrastate rates, which the APUC found to be just and reasonable following an exhaustive review, CIPL's 1982 interstate rates were approved without a reasonableness determination in an uncontested settlement.[11] *Cook Inlet Pipe Line Co.*, 38 FERC ¶ 61,083 (1989) (FERC Approval of Settlement). Because there has never been a determination by a regulatory body regarding whether CIPL's 1982 interstate rates were reasonable, this argument must fail.

▆▆▆ An uncontested settlement of the 1982 interstate rates does not establish that the rates are reasonable. *See Arctic Slope Regional Corp. v. Fed. Energy Reg. Comm'n*, 832 F.2d 158, 163–64 (D.C.Cir. 1987), *cert. denied*, 488 U.S. 868, 109 S.Ct.

175, 102 L.Ed.2d 145 (1988) (holding that a FERC-approved settlement need not assure just and reasonable rates); *see also Trans–Alaska Pipeline System*, 35 F.E.R.C. ¶ 61,-425 at 61,983 n. 17 (noting that justness of rates cannot be implied from an approved settlement "since the settlement rates were never adjudicated to be just and reasonable").

We agree with Tesoro Alaska Petroleum Company's (Tesoro) assessment that:

> It simply cannot be that *intrastate* tariff rates may be set by an *uncontested* settlement of *unreviewed interstate* tariff rates *before the FERC.* If the uncontested settlement of interstate tariff rates controls similar intrastate tariff rates, then procedurally the FERC could mandate *intrastate* tariff rates in every state without even a review as to the reasonableness of either the interstate or the intrastate tariff rates.

(Emphasis in original).

If courts found that unjust discrimination violative of the commerce clause resulted every time a state regulatory agency set an intrastate rate which was lower than the federally approved interstate rate for similar services, it would seem that Congress' efforts to respect state power over intrastate rates would have failed. Therefore, in conformity with federal authority, we reject the proposition that a difference between interstate and intrastate tariff rates, by itself, results in unjust discrimination against interstate commerce.[12]

---

**11.** Moreover, the settlement regarding the interstate rate included the following language:

> Pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, this agreement is a negotiated settlement with respect to all matters covered herein and the Commission and the parties hereto shall not have accepted as precedent, or approved, accepted, agreed to, or consented to any principle of ratemaking, cost of service determination, allocation method, or rate design formula underlying, supposed to underlie, or advanced by any party with respect to any of the rates here at issue or terms of this agreement. The Commission's approval of this agreement shall not constitute approval of, or precedent regarding, any principle or issue in this proceeding.

**12.** Our opinion in *United States v. RCA Alaska Communications, Inc.*, 597 P.2d 489 (Alaska 1979), does not require a different result. In that case we disapproved of the rate setting method by the APUC which likely would have resulted in "rate discrimination through hidden subsidies of some ratepayers by others." *Id.* at 504. We also concluded that "the APUC erred in considering the whole of RCAA's operations in its determination of whether interim rate relief should be granted.... [and] that separation of intrastate and interstate properties, expenses, and revenues is required for properly determining the adequacy of RCAA's intrastate rates." *Id.* at 499 (footnotes omitted). In this case CIPL makes no claim that the APUC failed to separate intrastate and interstate properties, expenses and revenues. CIPL claims only that the APUC is bound to accept a federally ap-

### D. Costs and Attorney's Fees.

Under Alaska Appellate Rule 508, the superior court awarded the APUC attorney's fees in the amount of $20,000 and awarded Tesoro attorney's fees and costs in the amount of $54,911.67. CIPL argues that Tesoro's efforts in this matter were duplicative of the APUC's. Therefore, CIPL contends it was inequitable for the superior court to award Tesoro more than twice the fees awarded to the original party. CIPL does not question the percentage of Tesoro's actual fees awarded.

CIPL also contends that the court improperly awarded fees of approximately $5,500 which Tesoro incurred prior to its intervention in superior court. Finally, CIPL argues that Tesoro failed to demonstrate why costs not covered by Rule 508(d) should be awarded.

Where a trial court sits as an intermediate appellate tribunal, it has broad discretion to award a party reasonable attorney's fees under Alaska Appellate Rule 508(e). *Rosen v. State Bd. of Public Accountancy*, 689 P.2d 478, 482 (Alaska 1984). Although we have required an explanation where the court denied an award of fees under Rule 508(e) we have never required an appellate court to articulate its reasons for an award. *Id.* at 480.

Based on our review, we cannot say that the attorney's fee award in this case is manifestly unreasonable. While it is true that Tesoro and the APUC address many of the same issues, we do not find Tesoro's efforts "completely duplicative." Tesoro's brief was helpful to this court. In the absence of any other challenge, we will not disturb the court's award of fees to Tesoro.

We similarly reject CIPL's argument that the fee award was improper in light of *Stepanov v. Homer Electric Ass'n, Inc.*, 814 P.2d 731 (Alaska 1991). In *Stepanov*, we held that "under Appellate Rule 508(e), attorney's fee awards, 'should … be limited to attorney's fees incurred in court, not those incurred in a prior administrative proceeding.'" 814 P.2d at 737

(quoting *Kenai Peninsula Borough v. Cook Inlet Region, Inc.*, 807 P.2d 487, 501 (Alaska 1991)).

Tesoro did not move to intervene in the appeal to the superior court until January 27, 1988. The actual fees upon which the award was based include fees from as early as May 18, 1987. However, the activity recorded for May 18, 1987 was "[r]esearch issues related to intervention at an appellate level when Tesoro was not a party to the administrative proceeding." While these fees were not "incurred in court" they were related to the appeal. Therefore, we conclude the trial court properly considered these fees in its award.

We will not disturb the court's award of costs not expressly included in Rule 508(d). "The costs included in Appellate Rule 508(d) are not meant to preclude the trial court's exercise of its sound discretion in awarding additional costs in a particular case." *State, Dep't of Educ. v. Nickerson*, 711 P.2d 1165, 1170 (Alaska 1985). CIPL has provided us with no persuasive arguments that the court abused its discretion in its cost award.

The judgment of the superior court which upheld the APUC's Methodology and Tariff Orders is AFFIRMED.

proved rate which was never determined to be reasonable.