*268 OPINION OF THE COURT
Hancock, Jr., J.
We hold that acts of the New York State Public Service Commission (PSC) in setting rates which compel a utility customer to pay for charitable contributions made by the utility constitute governmental conduct giving rise to a cognizable claim by that customer that his rights under the First Amendment of the United States Constitution have been violated.
I
In a CPLR article 78 proceeding against the PSC and New York Telephone Company (New York Tel.), petitioner, a customer of New York Tel., seeks to annul two actions of the PSC:
(1) The policy adopted by the PSC in 1970 whereby charitable contributions by utilities are allowed as "proper operating expenses” (New York Tel. Co., case 25155, 10 NY PSC 345, 378, 84 PUR3d 321, 349 [July 1, 1970])[1] and
*269 (2) The PSC "Opinion and Order Determining Revenue Requirement and Rate Structure” dated June 22, 1984 (opinion No. 84-16) specifically authorizing New York Tel. to charge its ratepayers, including petitioner, for charitable donations of approximately $3,000,000 in 1984, and establishing rates to be paid by customers for service which are based on the inclusion of these contributions as operating costs.
Petitioner, a Catholic, alleges that as a consequence of the PSC policy and rate order he is compelled to contribute to "religious institutions” espousing beliefs inconsistent with his own, to charities supporting "the right to an abortion” contrary to his "moral and religious” beliefs and to causes which he finds objectionable on "personal and political grounds”. "No matter how small a portion of his bill is affected”, he says, he opposes these contributions "as a matter of principle” and he asserts that the PSC has denied him his constitutional rights under the free speech, free exercise and establishment clauses of the First Amendment of the Federal Constitution, citing Abood v Detroit Bd. of Educ. (431 US 209).
In lieu of answering the petition, respondents[2] moved to dismiss (CPLR 7804 [fl; 3211 [a] [7]) contending, among other things, that the utilities’ actions in passing along the cost of charitable contributions were essentially private decisions and that the government’s limited involvement was an insufficient basis for finding a violation of petitioner’s First Amendment rights, citing Jackson v Metropolitan Edison Co. (419 US 345) and Blum v Yaretsky (457 US 991). Special Term rejected respondents’ arguments (128 Misc 2d 510) and the Appellate Division, with a divided court, affirmed, holding that petitioner had adequately stated a "threshold claim of 'State action’ ” by "alleging that the PSC adopted a policy which permitted the costs of charitable donations to be passed along to ratepayers” (113 AD2d 603, 606). The dissenters found that this case fell "squarely under” Blum and Jackson and that petitioner had failed to allege a sufficient nexus between the challenged acts and the State (id., at p 609).
The Appellate Division granted respondents permission to appeal to our court and certified the following question: "Did *270 this court err, as a matter of law, in affirming Special Term’s order which denied respondents’ motions to dismiss the petition?” For reasons which will appear, we hold that the question should be answered in the negative and that the order of the Appellate Division affirmed.
II
The critical issue is whether petitioner’s CPLR article 78 proceeding involves private conduct of a utility in which the State has merely acquiesced, as respondents and the dissenters contend, or governmental conduct of an agency of the State itself. Because it involves the latter we hold that under the controlling authority of Abood v Detroit Bd. of Educ. (431 US 209, supra) the petition states a cognizable claim that the 1970 policy decision and the 1984 rate order of the PSC violate petitioner’s rights under the First and Fourteenth Amendments of the United States Constitution. In Abood, plaintiffs, nonunion teachers, challenged the validity of a union shop clause in the collective bargaining agreement between their employer and the teachers’ union because dues they were compelled to pay were being used by the union for legislative lobbying and for the support of political candidates. The Supreme Court, in holding that plaintiffs’ rights were infringed by being forced to pay a portion of these contributions under threat of loss of their jobs, stated (at pp 235-236):
"[T]he freedom of belief is no incidental or secondary aspect of the First Amendment’s protections:
" 'If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.’ West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624, 642.
"These principles prohibit a State from compelling any individual to affirm his belief in God, Torcaso v. Watkins, 367 U.S. 488, or to associate with a political party, Elrod v. Burns, supra; see 427 U.S., at 363-364, n. 17, as a condition of retaining public employment.
* * *
"We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of politi *271 cal candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.” (Emphasis added.)
There is no basis for distinguishing Abood. The acts giving rise to the claims here and in Abood were not the private decisions of the utilities and the union to make charitable and political contributions but the governmental actions in compelling the utility customer here and the nonunion teachers in Abood to pay for them. In Abood the coercion came from the State-sanctioned union shop clause under which nonunion members could be discharged for nonpayment. In this proceeding, the coercion results from the fact that the State establishes the rate that the customer must pay and the rate includes an allowance for the objected to contributions. Because the utility is a monopoly the customer must pay or be deprived of his right to utility service.
The dissent points to no difference between the coercive effect of the PSC rate directives and the coercive effect of the union shop clause in Abood. Instead, for purposes of its argument, it constructs a model of a utility which omits the utility’s distinguishing characteristic as a legalized monopoly —public control. The dissent then analyzes the utility’s behavior "without any governmental intervention at all” (dissenting opn, at pp 278-279) as though it were a private company and readily concludes that "utility companies, like most unregulated business concerns, would simply include in the price for their services the cost of whatever charitable donations they might choose to make”, and that "the PSC has done no more than merely refuse to interfere with what is essentially a private decision.” (Dissenting opn, at p 279.) To reach these conclusions, it must be emphasized, the dissent has assumed the validity of two propositions: that "the regulatory powers of the State [are] not involved in the rate-setting process” (dissenting opn, at p 279) and that the charitable contributions reflected in the rates are "charges in which the PSC has, in the truest sense of the word, merely 'acquiesced’ ” (dissenting opn, at p 278). But these assumptions find no support in law or fact.
A public utility is franchised by the State (Public Service Law §§ 68, 99) to provide services to the public at just and *272 reasonable rates (Public Service Law §§ 65, 91) in exchange for a proper return on its investment (see, Public Service Law § 97; Matter of Village of Boonville v Maltbie, 272 NY 40). Operating as a monopoly (see, People ex rel. New York Edison Co. v Willcox, 207 NY 86, 93-94), it is subject to regulation by the PSC (Public Service Law §§ 66, 94). The PSC oversees the utilities for the public good as an exercise of the State’s police powers (People ex rel. New York Elec. Lines Co. v Squire, 145 US 175) and has exclusive authority to determine just and reasonable rates (Public Service Law § 66 [12]; § 92 [2]). It establishes maximum rates which may not be exceeded (Public Service Law § 65 [1]; § 91 [1]). In fact, no utility may charge more or less than the rates established by the PSC (see, Public Service Law § 66 [12]; § 92 [2]).
Aside from the fallacy of comparing a public utility to a private company because of the utility’s uniquely public character, the analogy which the dissent draws to the decisions of corporate officials of a private company in making charitable contributions (dissenting opn, at p 279) cannot stand for a more basic reason. What is at issue here is not the conduct of the utility officials, but the policy and directives of the PSC in establishing utility rates which include charitable contributions as operating expenses. And in any event the effect of a decision of a private corporation to pass through to its customers the costs of charitable contributions simply cannot be compared with the action of the PSC in setting utility rates which include such contributions. In the case of a private corporation a customer who disapproves has a voice — he may decide not to buy the product. In the case of a utility the customer has no voice — the contribution is locked into the rate approved by the PSC, and the customer must pay or go without service.
For the same basic reason — that this proceeding challenges the public conduct of the PSC and not the private conduct of the utilities — Jackson v Metropolitan Edison Co. (419 US 345, supra) and Blum v Yaretsky (457 US 991, supra) are inapplicable. In Jackson the suit was against the utility and not the Pennsylvania Utility Commission. The basis of the lawsuit was solely the private act of the utility in shutting off electric service, and the court simply dismissed plaintiff’s arguments that that private conduct should be attributed to the State merely because of its role in regulating the utility and in approving the regulations under which the termination was effected. Similarly, in Blum the actions which the nursing *273 home patients sought to attribute to the State were decisions made by "utilization review committees” of private nursing homes to transfer patients to facilities providing less intensive medical care. The court held that these committee decisions did not become State action solely because the nursing homes were subject to State regulation and the State responded to the decisions by adjusting the patients’ Medicaid benefits.
To bring the case within Jackson and Blum, the dissent, referring to the PSC’s brief (dissenting opn, at p 278), minimizes the function of the PSC in rate setting and characterizes its role as little more than passive acquiescence. Such a narrow view of the PSC’s function, as already noted, is at odds with the broad grant of rate-setting authority vested in the PSC by the Legislature (Public Service Law §§ 66, 72, 91). It also runs counter to our own decisions holding that the function of rate setting is left to the discretion of the Public Service Commission, and that so long as rates are just and reasonable, they may not be set aside (see, Matter of Abrams v Public Serv. Commn., 67 NY2d 205, 211-212; Matter of New York State Council of Retail Merchants v Public Serv. Commn., 45 NY2d 661).
As to petitioner, a customer who must purchase service from a public utility at rates established by the State, the combined effect of the utility’s monopoly status and the rate order is no less coercive than the threat of employment loss in Abood.[3] Like plaintiffs, who had a right to hold their jobs in Abood, petitioner, a member of the public in the utility’s franchised area, has an unquestioned legal right to utility service (Public Service Law §§ 65, 91). Like the plaintiffs in Abood, he must forego that right or be subject to the "compulsory subsidization of ideological activity” condemned in Abood (431 US, at p 237) and its progeny (see, Teachers v Hudson, 475 US 292, 106 S Ct 1066; Ellis v Railway Clerks, 466 US 435; Galda v Bloustein, 686 F2d 159). That petitioner’s proportionate share of the objected to contribu *274 tions is small is of no moment, "[f]or, whatever the. amount, the quality of [petitioner’s] interest in not being compelled to subsidize the propagation of political or ideological views that [he] oppose[s] is clear” (Teachers v Hudson, 475 US, at p —, 106 S Ct, at p 1075).[4] To petitioner Cahill one salient fact remains: he is compelled to support institutions he opposes on moral and religious grounds because he must subscribe to the utility and pay rates based, in part, on those contributions, or be deprived of his right to electric and telephone service.
We address only the question certified by the Appellate Division. The respondents’ remaining contentions, that the petition should be dismissed due to petitioner’s failure to exhaust administrative remedies, that the petition was not timely commenced, and that petitioner lacked standing to bring the proceeding are not before us. The certified question should be answered in the negative and the order of the Appellate Division should be affirmed, with costs.

.Prior to 1970 the PSC refused to allow inclusion of charitable contributions as operating expenses on the grounds that they were "not necessary to the conduct of business and that they [were] made at the sole discretion of Company officers to donees of their choosing.” (New York Tel. Co., case 25155 [July 1, 1970], at p 378.) The 1970 policy allows charitable contributions as "proper operating expenses” provided they are "not excessive in total” and that the donations are not irrelevant to the "civic responsibili *269 ties” of the utilities. Future allowances are to be measured from pre-1970 contribution levels.

.Central Hudson Gas and Electric Corporation, which supplies electricity to petitioner, was granted permission to intervene in this proceeding, and joined in the PSC’s motion to dismiss the petition.

.We note that the current policy of the PSC in permitting utilities to include charitable contributions as costs conflicts with judicial decisions in other jurisdictions holding similar pass-through provisions unlawful as involuntary levies on ratepayers (see, e.g., Pacific Tel. & Tel. Co. v Public Utils. Commn., 62 Cal 2d 634, 401 P2d 353 [1965]; Chesapeake & Potomic Tel. Co. v Public Serv. Commn., 230 Md 395, 187 A2d 475 [1963]; Illinois Bell Tel. Co. v Illinois Commerce Commn., 55 Ill 2d 461, 303 NE2d 364 [1973]; State ex rel. Laclede Gas Co. v Public Serv. Commn., 600 SW2d 222, 229 [Mo 1980], appeal dismissed 449 US 1072 [1981]).

.Justice Stevens in Teachers v Hudson (475 US 292, —, 106 S Ct 1066, 1075), stressing the point that "[t]he amount at stake for each individual dissenter does not diminish [his] concern”, writes: "In Abood, we emphasized this point by quoting the comments of Thomas Jefferson and James Madison about the tyrannical character of forcing an individual to contribute even 'three pence’ for 'the propagation of opinions which he disbelieves’ ”.