In the Matter of JOSEPH CAHILL, Respondent, and ROBERT ABRAMS, as Attorney-General of the State of New York, Respondent-Appellant, v PUBLIC SERVICE COMMISSION et al., Appellants-Respondents.

Third Department, June 1, 1989

## APPEARANCES OF COUNSEL

*William J. Cowan (Leonard Van Ryn* of counsel), for Public Service Commission, appellant-respondent.

*John M. Clarke (Lon S. Bannett, Gerald M. Oscar* and *Thomas J. Farrelly* of counsel), for New York Telephone Company, appellant-respondent.

*LeBoeuf, Lamb, Leiby & MacRae (Jeffrey W. Meyers, Cathleen McNulty* and *H. Peter Young* of counsel), for Niagara Mohawk Power Corporation, appellant-respondent.

*Gould & Wilkie (Robert J. Glasser* of counsel), and *Telford Taylor* for Central Hudson Gas & Electric Corporation, appellant-respondent.

*Nixon, Hargrave, Devans & Doyle (Stanley W. Widger, Jr.,*

and *Jeffrey C. Parnell* of counsel), for Rochester Gas and Electric Corporation, appellant-respondent.

*Robert Abrams, Attorney-General (Richard W. Golden, John W. Corwin* and *Mary Hilgeman* of counsel), *Bureau of Consumer Frauds and Protection, Energy and Utility Section,* for respondent-appellant.

*Lankenau Kovner & Bickford (Richard D. Emery* of counsel), for respondent.

*Josephine S. Trubek* for Rochester Telephone Corporation, and *David F. Smith* for National Fuel Gas Distribution Corporation, *amici curiae.* (One brief filed.)

*Alfred M. Hallenbeck* for Rochester Institute of Technology, *amicus curiae.*

### OPINION OF THE COURT

HARVEY, J.

The consolidated proceedings before this court already have a lengthy decisional history. The primary issue presented in these proceedings is the 1st Amendment challenge by petitioners of the policy of respondent Public Service Commission (hereinafter the PSC) authorizing the utilities under its control to pass along the cost of their charitable contributions to their customers as part of their utility rates. The proceeding commenced by petitioner Joseph Cahill against the PSC and respondent New York Telephone Company (hereinafter NYT) was previously before this court upon an appeal from the denial of respondents' preanswer motions to dismiss the petition on various grounds, including lack of State action (113 AD2d 603). This court affirmed the order with a divided court, holding that a threshold claim of State action had in fact been pleaded by petitioner. We subsequently granted respondents permission to appeal to the Court of Appeals and certified the following question: "Did this court err, as a matter of law, in affirming Special Term's order which denied respondents' motions to dismiss the petition?" The Court of Appeals subsequently affirmed this court's order, finding that Cahill's petition stated a cognizable claim (69 NY2d 265). An application by respondents to the United States Supreme Court for certiorari was denied (— US —, 108 S Ct 100).

During the pendency of this proceeding, respondents Niagara Mohawk Power Corporation (hereinafter NIMO), Rochester Gas and Electric Corporation (hereinafter RG&E) and

Central Hudson Gas & Electric Corporation (hereinafter Central Hudson) each requested a PSC order authorizing the recovery in rates of various amounts paid by the utilities during projected rate years as charitable contributions. Although petitioner Attorney-General intervened in the separate rate proceedings, arguing that such an allowance would violate ratepayers' rights under the 1st and 14th Amendments, the PSC rejected this argument and issued the requested orders. Thereafter, the Attorney-General commenced two CPLR article 78 proceedings against the PSC, NIMO, RG&E and Central Hudson seeking (1) annulment of the PSC's orders insofar as they allowed for recovery from the ratepayers for the utilities' charitable contributions, and (2) a refund, with interest, of all amounts collected pursuant to the orders. The PSC then successfully moved for consolidation of the proceedings commenced by the Attorney-General with the remanded Cahill proceeding.

Answers were interposed in all proceedings denying that the PSC's policy violates the 1st and 14th Amendment rights of ratepayers. Respondents also sought dismissal of the proceeding or an evidentiary trial in order to prove that the contributions charged to the ratepayers were not made for political, ideological or religious purposes even when the donations were made to, for example, sectarian institutions.

When the case was back before Supreme Court once again, the posture of the case had changed from a determination of whether the petition stated a cognizable claim to that of a determination of whether the claim was supported by the evidence. The court found that there was no disagreement among the parties as to facts which were material and relevant. Knowing that these facts were assumed by the Court of Appeals to be true when it made its decision as to a cognizable claim, Supreme Court determined that the policy of the PSC was violative of the ratepayers' constitutional rights.

It is our view that Supreme Court properly determined that the policy of the PSC allowing utilities to charge their charitable contributions to ratepayers as legitimate operating expenses impermissibly violates the ratepayers' 1st and 14th Amendment rights. Despite respondents' contentions otherwise, petitioners have sufficiently established that the ratepayers' 1st Amendment rights were infringed by the PSC's policy of compelling the ratepayers to defray the utilities' charitable expenses *(see; Abood v Detroit Bd. of Educ.,* 431 US 209, 233-235; *see also,* at 256 [Powell, J., concurring]; *Consolidated*

*Edison Co. v Public Serv. Commn.,* 447 US 530, 552 [Black-mun, J., dissenting]; *Matter of Consolidated Edison Co. v Public Serv. Commn.,* 66 NY2d 369, 373, *appeal dismissed* 475 US 1114). Cahill has sufficiently shown that the utilities support organizations which expound beliefs inconsistent with his religious beliefs as well as with his political and personal beliefs. The fact that respondents allege that the majority of the organizations they support are ideologically neutral and promote wholesome community-minded causes is of no conse-quence. Notably, the United States Supreme Court has clearly stated that nonpolitical speech is entitled to 1st Amendment protection *(see, Abood v Detroit Bd. of Educ., supra,* at 231).

It is not for this court to examine each contribution and subjectively decide which organizations particular individuals may or may not find offensive. What an individual chooses to believe and what organizations he or she chooses to support are personal decisions that should not be speculated upon. When it is actually the State compelling that individual to support these causes as a necessary condition to receiving utility service, then it is clear that the 1st Amendment has been violated *(see, Matter of Cahill v Public Serv. Commn.,* 69 NY2d 265, 270-271, *supra; see also, Abood v Detroit Bd. of Educ.,* 431 US 209, 235-236, *supra).* Thus, as the *Abood v Detroit Bd. of Educ. (supra)* case teaches us, it is the State's action in compelling the donations from the ratepayers and not the private decisions of the utilities as to where to bestow the money which is at issue here *(see, Matter of Cahill v Public Serv. Commn., supra).* Moreover, scrutinizing every charity or organization benefited by the utilities' donations would serve little purpose since neither this court nor the PSC could limit the utilities' choice of charities without impinging on the utilities' own free speech rights *(see, Consolidated Edison Co. v Public Serv. Commn.,* 447 US 530, *supra).*

Establishing that 1st Amendment rights have been impaired does not end our inquiry. Once this showing is made, it is necessary that respondents demonstrate that (1) the counter-vailing State interest is sufficiently important or compelling to justify the 1st Amendment infringement, and (2) that the means used were carefully or narrowly tailored to minimize the infringement *(see, Chicago Teachers v Hudson,* 475 US 292, 303, n 11; *Abood v Detroit Bd. of Educ., supra,* at 222-223; *Barber v Bullard,* 93 AD2d 672, 674, *affd* 61 NY2d 631). It has been said that, when resolving a conflict between individual rights and governmental goals, "[i]f the value of the right

clearly outweighs the value of the challenged practice, the [Constitution] proscribes the practice and the state has deprived [the individual] of a [guaranteed] right * * * by failing to protect the right from the impact of the challenged practice" (Nowak, Rotunda & Young, Constitutional Law, ch 14, § V, at 524-525 [2d ed]).

Addressing the first of these criteria, respondents emphasize the State's compelling interest in ensuring the provision of adequate utility service as justification for the compelled contribution policy. According to respondents, this interest is best served by allowing the utilities to include operating expenses such as charitable contributions in their rates. Respondents also contend that Business Corporation Law § 202 (a) (12) establishes State policy in favor of corporate giving and argue that the PSC practice of labeling charitable contributions as operating expenses merely implements this policy. The PSC has adopted the view that utilities: " 'have an obligation to the communities in which they are located and they are expected to recognize this obligation. It is our opinion that these contributions have an important relationship to the necessary costs of doing business' " (Re New York Tel. Co., case 25155, 84 PUR3d 321, 349, quoting Re United Gas Pipe Line Co., 54 PUR3d 285, 295, opn No. 428).

Concerning the latter argument, we find nothing compelling in the State's policy of permitting corporate giving since the giving of charitable contributions is wholly discretionary. However, as monopolies, the utilities are in an entirely different posture from that of private corporations since the customer does not have the option of choosing another service if a utility expends an inordinate amount on charitable donations and then passes the cost on to the ratepayer (see, Matter of Cahill v Public Serv. Commn., 69 NY2d 265, 272, supra). No necessary relationship between providing utility service and making charitable donations has been established. Respondents strain to demonstrate such a relationship by pointing to the benefits the community receives as a whole by the charitable contributions and how they improve the local business climate. In our view, it is purely speculative to argue that if compelled contributions were abolished utility service would suffer. Respondents offered no proof to support such a contention, nor could they. As previously mentioned, all charitable contributions are purely discretionary. Prior to the implementation of the present policy by the PSC in 1970, charitable contributions were made by the shareholders from the utili-

ties' profits with no apparent hardship to either the utilities or their customers. Consequently, the abolition of the present policy would not be disastrous and presumably would not discourage charitable contributions by utility shareholders since benefits such as good will toward the management of utilities would be a likely result.

It is also to be noted that the broad PSC policy at issue is unconstitutional because it is indisputably not narrowly tailored to meet State goals by the least restrictive means possible. No effort was ever made to allow ratepayers to choose which charities would benefit from their donations or to allow ratepayers to opt out from contributing altogether.

■ Another issue raised by the parties is the question of the Attorney-General's standing to bring his petitions. Similar to Supreme Court, we also find it unnecessary to reach this issue due to our finding that the PSC's policy should be abolished as should all orders implementing it. We also agree with Supreme Court's conclusion that the Attorney-General's request for refunds should not be granted in this particular case. In general, all parties agree that whether refunds should be ordered depends, among other things, upon (1) the reasonableness and degree of reliance by the utilities on the payments, and (2) the necessity of a refund to protect the substantive constitutional rights involved *(see, Roemer v Maryland Pub. Works Bd.,* 426 US 736, 767, n 23; *Lemon v Kurtzman,* 411 US 192).* Here, the equities weigh in favor of a prospective application only. The utilities involved relied on the validity of the PSC's policy of allowing charitable contributions as operating expenses. The computation of refunds would be a monumental task and is not necessary to vindicate the ratepayers' constitutional rights. It is our view that no refund should be ordered *(see, State Communities Aid Assn. v Regan,* 112 AD2d 681, 683, *lv denied* 69 NY2d 821).

MAHONEY, P. J., WEISS, LEVINE and MERCURE, JJ., concur.

Judgment affirmed, without costs.

Appeal from order dismissed, as academic, without costs.