# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 21
In the Matter of National Energy
Marketers Association, et al.,
   Appellants,
    v.
New York State Public Service
Commission,
   Respondent.
(And Two Other Related Proceedings.)
------------------------------------------------
No. 22
In the Matter of Retail Energy
Supply Association, et al.,
   Appellants,
    v.
Public Service Commission
of the State of New York, et al.,
   Respondents.
(And Two Other Related Proceedings.)

For Case No. 21:
Jason C. Cyrulnik, for appellants.
D. Scott Bassinson, for respondent.
New York State Office of the Attorney General et al., <u>amici</u> <u>curiae</u>.

For Case No. 22:
David G. Burch, Jr., for appellants.
D. Scott Bassinson, for respondents.
New York State Office of the Attorney General et al., <u>amici</u> <u>curiae</u>.

STEIN, J.:

On this appeal, we are asked to determine whether the Public Service Law authorizes the Public Service Commission (PSC) to issue an order that conditions access to public utility infrastructure by energy service companies (ESCOs) upon ESCOs capping

their prices such that, on an annual basis, they charge no more for electricity than is charged by public utilities unless 30% of the energy is derived from renewable sources. We conclude that the Public Service Law, in authorizing the PSC to set the conditions under which public utilities will transport consumer-owned electricity and gas, has such authority.

I.

The PSC was created at the beginning of the twentieth century to regulate and control public service corporations, as an exercise of the state's police powers, for purposes of "prevent[ing], on the one hand, the evils of an unrestricted right of competition and, on the other hand, the abuses of monop[o]ly" (People ex rel. New York Edison Co. v Wilcox, 207 NY 86, 94 [1912]; see Matter of Cahill v Public Serv. Commn., 69 NY2d 265, 272 [1986], cert denied 484 US 829, 830 [1987]). Consistent with that mandate, the PSC was given broad regulatory powers over public utilities to ensure that every utility "shall furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable" (Public Service Law § 65 [1]). Historically, public utilities were "vertically integrated monopolies," which "control[led] the generation of electricity [or production of gas], its transmission, and its distribution to consumers" (Morgan Stanley Capital Group, Inc. v Public Util. Dist. No. 1 of Snohomish Cty., 554 US 527, 535 [2008]). Those "[u]tility services have traditionally been 'bundled,'" with utilities charging customers a single rate for all services, including both the cost of the gas or electricity itself and of transporting that commodity (see Matter of Energy Assn. of N.Y. State v Public Serv. Commn. of State of N.Y., 169 Misc 2d 924, 933 [Supreme Court,

Albany County 1996], <u>affd on other grounds</u> 273 AD2d 708 [3d Dept 2000], <u>lv</u> <u>denied</u> 95

NY2d 765 [2000]).

During the 1980s – in an effort "to stimulate production of natural gas indigenous

to New York State thereby benefiting local producers, diversifying the State's energy

supplies and increasing competition within the natural gas industry by providing an

economical means for [less expensive] local gas to be marketed" – the legislature granted

the PSC authority to establish a retail energy market by requiring public utilities to

transport natural gas from local producers to consumers through the utilities' pipelines

(<u>Rochester Gas & Elec. Corp. v Public Serv. Commn. of State of N.Y.</u>, 71 NY2d 313, 317

[1988]; <u>see</u> L 1984, ch 519 § 1 [legislative findings]).  Under Public Service Law § 66-d

(2), the PSC is authorized to order, "upon such terms and subject to such conditions as the

commission considers just and reasonable, . . . any gas corporation to transport or contract

with others to transport gas under contract for sale by such producer or owned by such

consumer," subject to certain limitations, including a finding that "the gas corporation has

available capacity."  Essentially, section 66-d "allowed consumers to purchase gas still in

the ground and compelled utilities to transport it to them . . . if the consumer[s] paid for the

use of the utility's pipelines" (<u>Rochester Gas</u>, 71 NY2d at 318).  Following enactment of

the statute, the PSC "ordered [utilities] to file a tariff establishing rates for transportation

of nonowned gas" (<u>id.</u> at 319).[1]  By its terms, section 66-d applies only to the gas industry.

---

[1] This Court rejected a utility's constitutional challenges to Public Service Law § 66-d, as
well as the PSC's implementation of it, concluding that it was a valid exercise of the state's
police power and did not result in an impermissible taking of the utility's property (<u>see</u>
<u>Rochester Gas</u>, 71 NY2d at 317).

However, upon the PSC's determination that a similar restructuring of the electric service industry would benefit consumers by decreasing electricity prices, increasing customer choice and leading to the development of innovative new products and services as suppliers competed for customers, the PSC adopted a similar scheme for the electric industry in the 1990s (see 1996 NY PSC Op No. 96-12 at 25-31).

These statutory and regulatory measures effectively required that the different services provided by utilities be "unbundled" so that non-utility suppliers, such as ESCOs, could sell energy commodities directly to consumers by using the utilities' delivery infrastructure. It was expected that market forces and competition would, over time, produce lower rates (see id. at 28), "while allowing customers to retain the level of protection they enjoy[ed] . . . if that [was] their choice" (1997 NY PSC Op No. 97-5, at 42). The PSC explained that it "intend[ed] to monitor the market's development[,] and to take corrective action should problems arise, and, when necessary, to adapt [its] policies as the market evolve[d]" (id.).

The PSC exercised oversight of ESCOs through its control over utilities and their delivery infrastructure; specifically, it "require[d] the utilities to reflect certain aspects of [its] approved ESCO oversight process in their tariffs" by "set[ting] forth the criteria an ESCO, as a customer of the utility, would have to meet in order to purchase delivery services from the utility" (id. at 44).[2] To maintain that eligibility, "ESCOs must meet

_____

[2] In a separate opinion, the PSC explained that its "general supervisory duties normally extend to those electric [and gas] corporations that have 'authority . . . to lay down, erect or maintain wires, pipes, conduits, ducts or other fixtures in, over or under the streets, highways and public places'" (1997 NY PSC Op No. 97-17, at 34, quoting Public Service

specific compliance and reporting requirements on an ongoing basis" (id. at 43).   To that

end, the PSC adopted the Uniform Business Practices (UBP), a set of rules regulating

ESCOs' business and marketing practices; in addition, the PSC directed major gas and

electric corporations to file revised tariffs embodying the UBP's access rules (see Case 98-

M-1343, 1999 NY PSC Op No. 99-3).  It is undisputed that ESCOs have been operating

for almost 20 years pursuant to PSC oversight and regulation, as reflected in the UBP's

requirements.

In 2014, following an investigative process, the PSC issued an order finding that

ESCOs were generally charging their residential or small-scale customers higher prices

than the prices charged by utilities (see Proceeding on Motion of the Commission to Assess

Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in

New York State, 2014 WL 805942, at *1-*2 [No. 12-M-0476, Feb. 25, 2014]). Two years

later, the PSC issued the challenged order – the Reset Order – to address that concern (see

Order Resetting Retail Energy Rates & Establishing Further Process [2-23-16]).   As

relevant here,[3] the order stated:

> "1. . . . [E]ffective [10] calendar days from the date of this [o]rder,
> [ESCOs] shall only enroll new residential or small-
> nonresidential customers (mass market customers) or renew
> existing mass market customers in gas or electric service if at
> least one of the following two conditions is met: (1) enrollment

Law § 66 [1]).  The PSC concluded that it lacked authority to "regulate directly [ESCOs]
that do not own, operate, lease, lay down, erect or maintain wires, pipes, conduits, ducts or
other fixtures in, over or under public property" (id. [emphasis added]).  Therefore, the
PSC established an "oversight process" pursuant to which "ESCOs agree to provide
specific and limited consumer protections as a condition of tariffed distribution service"
(id. at 33-34).

[3] The Reset Order has five other provisions that are not challenged.

where the contracts guarantees that the customer will pay no more than were the customer a full-service customer of a utility; or (2) enrollment based on a contract for an electricity product derived from at least 30% renewable sources.

2. ESCOs must receive affirmative consent from a mass market customer prior to renewing that customer from a fixed rate or guaranteed savings contract into a contract that provides renewable energy but does not guarantee savings.

3. For each ESCO that intends to enroll new mass market customers or renew existing mass market customers once [the first provision of the order] has gone into effect, . . . the ESCO must make a filing by 4:00 pm on the [10th] calendar day[] after the date of this [o]rder certifying that any enrollments will comply with the conditions of this [o]rder."

The PSC explained that it issued the Reset Order in response to "a large number of complaints" it had received "from ESCO customers about unexpectedly high bills," and had determined that mass market customers were not receiving comparable benefits to those received by large commercial and industrial customers. Thus, "an immediate transition away from a retail market focused on commodity only without price protection, to a market in which competitive ESCOs provide services of demonstrated value to consumers, [was] warranted." Specifically, the PSC concluded, based on the performance of the ESCO market, that "additional restructuring [of the market was] necessary to further protect consumers from high-pressure sales situations, deceptive marking, slamming [i.e., enrolling customers without authorization], and lack of expected savings."

The PSC opined that it had authority to issue the Reset Order pursuant to Public Service Law articles 1 and 2 – specifically sections 5 and 53, which it interpreted as providing "broad legal authority to oversee ESCOs" – and section 66 (5), which the PSC

reasoned, grants it "authority over the tariffed rules and regulations of electric and gas utilities." The PSC clarified that it is under those tariffed rules that it "has placed conditions on when the distribution utilities may allow ESCOs to use utility infrastructure to distribute electricity and natural gas to ESCO customers." Thus, while the language of the three challenged clauses of the Reset Order appears to be directed solely at ESCOs, rather than to the regulation of utilities transporting ESCOs' products through their infrastructure, the entirety of the PSC's order makes clear that the PSC relied on its ability to regulate utilities' tariffed rules in "confirm[ing] its authority to oversee ESCO participation in the residential and small commercial markets . . . to ensure sufficient protection of the public interest and that the prices that consumers pay for those services are just and reasonable."

Following issuance of the Reset Order, petitioners – ESCOs and their representative trade associations – commenced these two separate proceedings, which are combined CPLR article 78 proceedings and actions for declaratory judgment, seeking a declaration that the Reset Order is void, as well as a permanent injunction enjoining the PSC from enforcing the first three clauses of the Order. The National Energy Marketers Association petitioners alleged, among other things, that the Reset Order should be annulled as arbitrary and capricious and in excess of the PSC's authority, and sought a declaratory judgment that the first three provisions of the Reset Order are void and unenforceable because the PSC "acted without jurisdiction in issuing [the] Order." The Retail Energy Supply Association petitioners sought, among other things, to annul the Reset Order on the ground that the PSC exceeded its authority in issuing the order and a declaration that the order: (1) constituted a regulatory taking that deprived them of their vested property rights in their

businesses in violation of the Federal and State constitutions; (2) violated their vested property rights in their businesses in contravention of their substantive due process rights under the Federal and State constitutions; and (3) was unconstitutionally vague. All of the petitioners argued that the Reset Order was contrary to the PSC's jurisdictional mandate because it purports to limit the price that ESCOs may charge their customers to that charged by local utilities, despite the absence of authorization in the Public Service Law for the PSC to regulate ESCOs' rates for the provision of retail energy services.

Supreme Court granted the petitions to the extent of vacating the challenged provisions of the Reset Order, and remitted to the PSC "for further proceedings, including [n]otice specific to the directives of the . . . Reset Order." The court did not expressly issue a declaration, but concluded that the PSC has the power to regulate ESCOs in the manner asserted in the Reset Order, stating "that it is counterintuitive to claim that the PSC lacks jurisdiction over the retail energy market," inasmuch as the PSC created the retail energy market and adopted the UBP "to oversee virtually every aspect of the market, from eligibility, to marketing and contracts, and policing abuses as they affect its customers." Nevertheless, the court determined that the Reset Order should be vacated because petitioners were denied procedural due process due to the PSC's failure to provide them with adequate notice under the State Administrative Procedure Act and an opportunity to be heard prior to the order's adoption.

Upon the parties' cross-appeals,[4] the Appellate Division unanimously affirmed (152 AD3d 1133 [3d Dept 2017]; 152 AD3d 1122 [3d Dept 2017]).  The Court stated that "[t]he paramount issue presented is whether the PSC has the authority to impose the rate-making limitations on ESCOs set forth in the Reset Order" (152 AD3d at 1136).  As relevant here, the Court held "that the PSC's broad statutory jurisdiction and authority over the sale of gas and electricity" set forth in the Public Service Law "authorized it to impose the limitations set forth in the Reset Order" (id. at 1137-1138).  "In fact," the Court concluded, "it is the PSC's broad jurisdiction that enabled it to allow ESCOs access to utility systems in the first place . . . [and] this same authority allows [the PSC] to allow it to impose limitations on ESCO rates as a condition to continued access" (id. at 1138).

This Court subsequently granted petitioners leave to appeal.

II.

Initially, the PSC maintains that an entity's use of any of its property – real or personal – for the "sale" of gas or electricity establishes that the entity is a "gas corporation" or "electric corporation" within the meaning of Public Service Law § 2.  Because ESCOs use personal property in the sale of gas and electricity, the PSC argues that they operate gas and electric plants and the PSC, therefore, has the statutory authority to require them to pay just and reasonable rates under Public Service Law § 65 (1).

---

[4] Petitioners appealed from that part of Supreme Court's order that determined "the [PSC's] authority and jurisdiction to set rates in the retail energy markets."  The PSC cross-appealed from the order insofar as it held that the PSC "denied procedural due process or could not rely upon the unworkability of the retail electric market or the record before the [PSC].  The [PSC] d[id] not appeal the conclusion that it violated the State Administrative Procedure Act."

We reject the PSC's argument that ESCOs fall within the definitions of "gas corporations" and "electric corporations" set forth in Public Service Law § 2 such that they are subject to the PSC's direct rate-making authority under Public Service Law article 4 (see Public Service Law § 66 [1] [5]).[5]  Section 2 provides that the terms "gas corporation" and "electric corporation" include "every corporation, company, association, joint-stock association, partnership and person . . . owning, operating or managing any gas plant" (id. § 2 [11]) or "electric plant" (id. § 2 [13]), with certain exceptions inapplicable here.  In turn, the terms "gas plant" and "electric plant" are defined as "includ[ing] all real estate, fixtures and personal property operated, owned, used or to be used for or in connection with or to facilitate the manufacture, conveying, transportation, distribution, sale or furnishing . . . of gas . . . for light, heat or power" (id. § 2 [10]) or "electricity for light, heat or power" (id. § 2 [12]).

By definition, gas and electric corporations are entities or persons that own, operate or manage a "gas plant" or "electric plant" (id. § 2 [11], [13]).  The Public Service Law defines a "plant" consistent with the term's plain meaning – as encompassing "all real estate, fixtures and personal property" used for, among other things, the sale of gas and electricity (id. § 2 [10]; [12] [emphasis added]).  Section 2 does not state that a plant consists of "real estate, fixtures or personal property" used to do the same, which is how the PSC reads the statute for purposes of this appeal.  Thus, the PSC's reading of section 2

_____

[5] As petitioners argue, the statutory interpretation issues raised in this appeal involve matters "of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent" and, thus, "de novo review is appropriate" (Weingarten v Board of Trustees of N.Y. City Teacher's Retirement Sys., 98 NY2d 575, 580 [2002]).

contradicts the plain statutory language, violating the fundamental canon of construction that, "[w]hen the statutory language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of the words used" (People v Pabon, 28 NY3d 147, 152 [2016] [internal quotation marks and citations omitted]).

Moreover, adoption of the PSC's interpretation of the statutes would render Public Service Law § 53 meaningless. Section 53 provides that, for purposes of Public Service Law article 2 only – which addresses limited consumer protection measures – "a reference to a gas corporation, an electric corporation, a utility company, or a utility corporation shall include, but is not limited to, any entity that, in any manner, sells or facilitates the sale or furnishing of gas or electricity to residential customers." If the more general definitions of gas and electric corporations in Public Service Law § 2 covered ESCOs, there would have been no need for the legislature to enact section 53 in 2002.[6] Thus, acceptance of the PSC's interpretation of section 2 would require us to disregard the "'accepted rule that all parts of a statute are intended to be given effect and that a statutory construction which renders one part meaningless should be avoided'" (Matter of Springer v Board of Educ. of the City Sch. Dist. of the City of N.Y., 27 NY3d 102, 107 [2016], quoting Rocovich v Consolidated Edison Co., 78 NY2d 509, 515 [1991]).

---

[6] In fact, the legislature enacted section 53 in order to overturn a 1997 decision of the PSC confirming that ESCOs that do not provide transmission and delivery service are exempt from complying with the consumer protections set forth in article 2 because they are not "gas corporations" and "electric corporations" (see 1997 NY PSC Op No. 97-17, at 34-35; see also Budget Report on Bills, Bill Jacket, L 2002, ch 686, at 4; PSC Ltr, id. at 13).

III.

While ESCOs do not fall within the definition of "gas corporation" and "electric corporation" – and, therefore, are not subject to the PSC's direct rate-making authority under Public Service Law article 4 – we nevertheless conclude that, under its authority to regulate utilities' transportation of ESCOs' gas and electricity, the PSC may condition access to utility infrastructure upon ESCOs' compliance with a price cap on gas or electricity.  Public Service Law § 5 (1) (b), provides that the PSC's "jurisdiction, supervision, powers and duties . . . shall extend . . . [t]o the manufacture, conveying, transportation, sale or distribution of gas . . . and electricity for light, heat or power," as well as "to gas plants and to electric plants and to the persons or corporations owning, leasing or operating the same" (id. § 5 [1] [b] [emphasis added]).  The language of section 5 (1) (b) does not constrain the PSC's broad regulatory powers to those that impact only the activities of owners and operators of gas and electric plants.  Indeed, as this Court has recognized for over a century, the PSC's purpose is to regulate and control public utilities, not only to prevent the abuses of monopoly, but also "the evils of an unrestricted right of competition" (Wilcox, 207 NY at 94).  In other words, contrary to petitioners' arguments, the PSC is not charged solely with monitoring abuses of monopoly power by "electric corporations" and "gas corporations," i.e., utilities.  Rather, in the context of its power to supervise the "conveying, transportation, sale or distribution of gas . . . and electricity" (Public Service Law § 5 [1] [b]), the PSC has always had the additional duty of preventing "extortionate competition" and "oppressive or discriminating charges" (Wilcox, 207 at 93-94).

Public Service Law §§ 66-d (2) states, in relevant part, that,

> "after notice and hearing [the PSC] shall, upon such terms and subject to such conditions as the [PSC] considers just and reasonable, have the authority to order any gas corporation to transport or contract with others to transport gas under contract for sale by such producer or owned by such consumer."

In giving the PSC discretionary power to require gas corporations to transport energy sold by ESCOs "upon such terms and subject to such conditions as the [PSC] considers just and reasonable," section 66-d (2) necessarily directs the PSC to determine the terms and conditions under which utilities will be required to transport ESCOs' gas through their delivery infrastructure.[7]

Article 4 provides direct support for the PSC's authority to regulate utilities' infrastructure and thus condition ESCO's access to that infrastructure on compliance with a price cap. Section 65 (1) requires that all utilities provide "service, instrumentalities and facilities" that are "in all respects just and reasonable." Nothing in the language of the relevant statutory provisions limits the PSC's consideration of what is "just and reasonable" to ensuring only that utilities receive a fair price for transporting ESCOs' energy; in fact, section 65 (1) provides that utility service must be just and reasonable "in all respects" (see also Public Service Law § 66 [5] [directing the PSC to "[e]xamine all . . . corporations . . . under its supervision" to determine whether, among other things, "the rates, charges or classifications or the acts or regulations of any such . . . corporation . . .

---

[7] As explained above, the PSC adopted a similar scheme for the electric industry, leading to the formation of ESCOs as a direct result of the PSC's decision to increase market competition and make utility infrastructure available to nonutility service providers.

are unjust [or] unreasonable"]). In authorizing the PSC to ensure that the terms by which utilities provide ESCOs access to public infrastructure remain "just and reasonable," sections 65 (1) and 66-d (2) support the PSC's long-held position that it has the authority to regulate ESCOs' eligibility to transport energy over public utilities' infrastructure.

Put differently, a necessary corollary of the PSC's authority to regulate utilities' delivery of ESCOs' energy is that the PSC has the authority to determine the terms and conditions under which ESCOs are eligible to purchase delivery services – for both gas and electricity – from utilities. Indeed, petitioners do not dispute that the PSC has properly regulated ESCOs pursuant to the UBP's eligibility requirements – i.e., the terms by which utilities are required to permit ESCOs access to their infrastructure – since 1999. Petitioners fail to adequately explain why the PSC may set conditions for eligibility to access public utility lines but may not, as one of those conditions, cap the prices charged by ESCOs, viewed cumulatively on an annual basis, to the same amount as those charged by public utilities. It is not enough to simply point to the fact that the PSC has no rate-making authority over ESCOs under Public Service Law article 4, without distinguishing between setting the rate that must be charged for energy and determining eligibility for access as set forth in the UBP, incorporated into utility tariffs. While "no utility may charge more or less than the rates established by the PSC" (Cahill, 69 NY2d at 272), ESCOs may charge less.

Finally, we observe that the legislature expressly recognized the PSC's authority to regulate ESCOs' eligibility to access public utilities' infrastructure in General Business Law § 349-d (11), which preserves the PSC's preexisting "authority . . . to limit, suspend

or revoke the eligibility of an energy services company to sell or offer for sale any energy services for violation of any provision of law, rule, regulation or policy enforceable by [the PSC]." The language in section 349-d reserving the PSC's authority to suspend ESCOs' eligibility would be meaningless if such authority did not already exist; thus, section 349-d further supports the PSC's contention that it has authority to condition ESCOs' eligibility to access utility systems.

Because the PSC is empowered to regulate utilities' transportation of gas and electricity and created the ESCO markets for the benefit of consumers, and because the legislature has delegated to the PSC the authority to condition ESCOs' eligibility to access utility lines on such terms and conditions that the PSC determines to be just and reasonable, it follows that the PSC has authority to prohibit utilities from distributing overpriced products by conditioning ESCOs' access on a price cap. That is, the statutory framework permits the PSC, pursuant to its authority to regulate the energy market, to impose a price cap on ESCOs as a condition of eligibility. Therefore, although the PSC has no direct rate-making authority over ESCOs, it did not exceed its statutory authority in determining that public utility transportation of energy sold by ESCOs is not "just and reasonable" if ESCOs are charging consumers more than that charged by public utilities. Thus, the courts below should have issued a declaration to the effect that the PSC did not exceed its authority under the Public Service Law or violate petitioners' constitutional rights in issuing the Reset Order.

Petitioners' procedural due process argument is moot and their remaining arguments lack merit. Accordingly, the Appellate Division orders insofar as appealed from should be

modified, with costs to respondents, in accordance with the decision herein and, as so modified, affirmed.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

For Case No. 21:  Order insofar as appealed from modified, with costs to respondent, in accordance with the opinion herein and, as so modified, affirmed.  Opinion by Judge Stein. Chief Judge DiFiore and Judges Rivera, Garcia, Wilson and Feinman concur.  Judge Fahey took no part.

For Case No. 22:  Order insofar as appealed from modified, with costs to respondents, in accordance with the opinion herein and, as so modified, affirmed.  Opinion by Judge Stein. Chief Judge DiFiore and Judges Rivera, Garcia, Wilson and Feinman concur.  Judge Fahey took no part.

Decided May 9, 2019