Frasier v Niagara Mohawk Power Corp. (2026 NY Slip Op 01110)

Frasier v Niagara Mohawk Power Corp.

2026 NY Slip Op 01110

Decided on February 26, 2026

Appellate Division, Third Department

Garry, P.J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:February 26, 2026

CV-25-0456

[*1]Rick Frasier et al., Appellants,
vNiagara Mohawk Power Corporation, Doing Business as National Grid, Respondent.

Calendar Date:January 8, 2026

Before: Garry, P.J., Ceresia, Fisher, McShan and Mackey, JJ.

Harris Beach Murtha Cullina PLLC, Pittsford (Kyle D. Gooch of counsel), for appellants.
Barclay Damon, LLP, Albany (Erik D. Nadolink of Wheeler Trigg O'Donnell LLP, Denver, Colorado, of counsel, admitted pro hac vice), for respondent.
John J. Sipos, Public Service Commission, Albany (Joshua M. Tallent of counsel), amicus curiae.

Garry, P.J.
Appeal from an order of the Supreme Court (Martin Auffredou, J.), entered January 31, 2025 in Fulton County, which granted defendant's motion to, among other things, refer certain issues to the Public Service Commission and stay the matter pending that determination.
Plaintiff Elmvue Farms, LLC is a cattle and dairy farm in the City of Johnstown, Fulton County. Plaintiff Rick Frasier owns the farm, operated by his family for generations, as well as the real property upon which the farm is situated. Defendant is an electric corporation that services the property and the surrounding area at large. In 2005, plaintiffs, with the assistance of defendant, made certain updates to the farm to accommodate electrical milking equipment. According to plaintiffs, they began to notice issues with their herd in or around 2012, including behavioral changes, decreased milk production, fertility issues and other health problems, and began to suspect that there was stray voltage [FN1] on the property. Defendant investigated the conditions at the farm and concluded that some stray voltage slightly exceeding defendant's self-imposed 0.5-volt threshold for remediation was present. Defendant thereafter installed a neutral isolator, intended to electrically isolate the farm from the remainder of the power distribution system under normal conditions. The farm operated on the isolated system without further complaint until 2019, when plaintiffs commenced this tort action.
In this action, plaintiffs set forth claims for negligence, private nuisance, trespass to land and trespass to chattels and seek both damages and mandatory injunctive relief compelling defendant to abate the stray voltage affecting the property. In 2022, following joinder of issue, defendant offered to reconfigure and rewire the farm's electrical service at its own expense. According to plaintiffs, those repairs only exacerbated the problem. Supreme Court denied plaintiffs' ensuing motion for preliminary injunctive relief. With the action trial ready, defendant moved for a stay and referral to the Public Service Commission (hereinafter PSC) pursuant to the primary jurisdiction doctrine, for the PSC to determine the existence and order the mitigation of any problematic stray voltage on plaintiffs' property. Plaintiffs opposed. Supreme Court granted the stay, finding that the issues surrounding the allegations of stray voltage and what steps are appropriate to remediate same implicate the PSC's special competence and overarching regulatory interests. The court specifically ordered the PSC to "determine (1) whether defendant's electrical distribution system is producing harmful levels of stray voltage at plaintiffs' farm that require mitigation; (2) if so, how best to remediate or mitigate that condition; and (3) any other issue arising within or from this action that PSC may determine to be within its purview upon presentation of such issue to the PSC by any party to this action." Plaintiffs appeal. With this [*2]Court's permission, the PSC has filed a brief amicus curiae in support of plaintiffs.
"The doctrine of primary jurisdiction applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views" (Staatsburg Water Co. v Staatsburg Fire Dist., 72 NY2d 147, 156 [1988] [internal quotation marks and citation omitted]; see Romine v Laurito, 186 AD3d 913, 915 [3d Dept 2020], appeal dismissed 36 NY3d 939 [2020], appeal dismissed & lv denied 36 NY3d 1088 [2021]). The doctrine "is intended to co-ordinate the relationship between courts and administrative agencies to the end that divergence of opinion between them not render ineffective the statutes with which both are concerned, and to the extent that the matter before the court is within the agency's specialized field, to make available to the court in reaching its judgment the agency's views concerning not only the factual and technical issues involved but also the scope and meaning of the statute administered by the agency" (Capital Tel. Co. v Pattersonville Tel. Co., 56 NY2d 11, 22 [1982]; see Calle v National Grid USA Serv. Co., Inc., 230 AD3d 556, 556-557 [2d Dept 2024]). "There is no fixed formula governing the application of the doctrine to the facts of a particular case. Rather, the court must determine in each case whether the reasons for the doctrine are present and whether the purposes of the doctrine will be served by its application" (Heller v Coca-Cola Co., 230 AD2d 768, 769 [2d Dept 1996] [citation omitted], lv dismissed & denied 89 NY2d 856 [1996]; see Lauer v New York Tel. Co., 231 AD2d 126, 129 [3d Dept 1997]). 
The PSC has broad regulatory authority over whether utilities are safely furnishing services, such as electricity (see Public Service Law § 65 [1]; Matter of National Energy Marketers Assn. v New York State Pub. Serv. Commn., 33 NY3d 336, 341 [2019]; Matter of Cahill v Public Serv. Commn., 69 NY2d 265, 272 [1986], certs denied 484 US 829, 830 [1987]). Indeed, among the express powers delegated to the PSC are the powers to "examine or investigate the methods employed by . . . corporations . . . in manufacturing, distributing and supplying . . . electricity . . . and in transmitting the same" and "to order such reasonable improvements as will best promote the public interest, preserve the public health and protect those using such . . . electricity and those employed in the manufacture and distribution thereof" (Public Service Law § 66 [2]). Further, "whenever the [PSC] shall be of opinion, after a hearing had upon its own motion or upon complaint, that the property, equipment or appliances of any such . . . corporation . . . are unsafe, inefficient or inadequate, the [PSC] shall [*3]determine and prescribe the safe, efficient and adequate property, equipment and appliances thereafter to be used, maintained and operated for the security and accommodation of the public" (Public Service Law § 66 [5]). The PSC has exercised its general supervisory authority over electric utilities with respect to stray voltage by imposing self-testing, mitigation and reporting requirements regarding same and by adopting the National Electric Safety Code with respect to the installation, construction, maintenance and operation of electric facilities (see Proceeding on Motion of the Commission to Examine the Safety of Electric Transmission and Distribution Systems, NY PSC Case No. 04-M-0159 [Mar. 22, 2013]).
Nonetheless, we agree with plaintiffs, and the amicus, that referral to the PSC is not warranted under the circumstances. Assuming, without deciding, that the regulatory scheme is an appropriate means to address some of the issues underlying these tort claims (see generally 16 NYCRR 12.1 [a]), compliance with regulatory standards is not dispositive as to due care (see Miner v Long Is. Light. Co., 40 NY2d 372, 380-381 [1976]; Holtz v Niagara Mohawk Power Corp., 147 AD2d 857, 859 [3d Dept 1989]). Upon a stay and referral, the PSC would have only the authority to determine whether defendant is presently operating in compliance with its administrative standards, which set forth minimum, generalized safety requirements. As PSC asserts and as evidenced by the opinions and reports of plaintiffs' experts, the duty of care with respect to stray voltage on dairy farms may be quite different from this regulatory floor. The PSC also admittedly has no expertise in the impact of stray voltage on cattle and has advised that it would be necessary to seek out the opinion(s) of its own experts if tasked with evaluating whether any stray voltage here is "harmful" or merits mitigation beyond the aforementioned standards.
We are sensitive to the needs of Supreme Court, as the subject matter underlying this litigation is clearly quite complex; the parties' experts sharply dispute several highly technical concepts, such as the proper means for identifying stray voltage in the first instance. However, this state's courts are not unacquainted with stray voltage cases and cases against electric utilities more broadly (see e.g. Smith v Consolidated Edison Co. of N.Y., Inc., 104 AD3d 428, 428-429 [1st Dept 2013]; Flex-O-Vit USA v Niagara Mohawk Power Corp., 292 AD2d 764, 765-766 [4th Dept 2002], lv dismissed 99 NY2d 532 [2002]; Lane v New York State Elec. & Gas, 99 AD2d 597, 597-599 [3d Dept 1984]; see generally PJI 2:195, 2:200, 2:206). As plaintiffs argue, the claims at issue, which do not arise from the PSC's rules, regulations or policies, are common-law tort claims, requiring determinations as to familiar concepts such as duty and causation, and are inherently judicial (compare Riverdale Jewish Ctr. v Brooklyn Union Gas Co., 237 AD3d 414, 415 [1st Dept 2025]; Calle [*4]v National Grid USA Serv. Co., Inc., 230 AD3d at 557; Romine v Laurito, 186 AD3d at 915; Township of Thompson v New York State Elec. & Gas Corp., 25 AD3d 850, 851-852 [3d Dept 2006], lv denied 6 NY3d 713 [2006]; Brownsville Baptist Church v Consolidated Edison Co. of N.Y., 272 AD2d 358, 359 [2d Dept 2000]; Guglielmo v Long Is. Light. Co., 83 AD2d 481, 483-484 [2d Dept 1981]). As with other complicated areas of tort, the necessary expertise is initially supplied by the parties' experts. To the extent that the divergence between those experts on scientific principles may necessitate additional guidance, Supreme Court possesses the authority to utilize a referee or court-appointed neutral expert to aid in the review of complex litigation where appropriate (see CPLR 4001, 4212; Matter of Harkenrider v Hochul, 38 NY3d 494, 522-523 [2022]; Kesseler v Kesseler, 10 NY2d 445, 448-449 [1962]; Kaplowitz v Borden, Inc., 189 AD2d 90, 93 [1st Dept 1993]; Zirinsky v Zirinsky, 138 AD2d 43, 46 [1st Dept 1988]). In sum, although the PSC's opinion as to the existence, origin or degree of stray voltage may be informative, resolution of plaintiffs' claims do not first require resolution of issues placed within the agency's special competence.
There is similarly no threat of inconsistent adjudications or need to coordinate between these two branches of government under the circumstances. Any concerns regarding a theoretical injunctive remedy are unpersuasive as Supreme Court may merely order that problematic stray voltage, if it is determined to exist, be abated (see Siewert v Northern States Power Co., 793 NW2d 272, 286 [Minn 2011]). We further note that, although plaintiffs made specific repair/replacement demands in their unsuccessful motion for a preliminary injunction, they concede upon appeal that the only relief they truly desire in that respect is abatement.
For these reasons, we reverse. In light of our disposition, we do not address plaintiffs' remaining contentions.
Ceresia, Fisher, McShan and Mackey, JJ., concur.
ORDERED that the order is reversed, on the law, with costs.

Footnotes

Footnote 1: Stray voltage requires a general understanding of how a grounded-neutral electrical distribution system operates. It is commonly understood that electricity must travel in a circuit. For our purposes, it is enough to say that electricity leaves a substation on phase conductors, like power lines, passes through electrical loads, like appliances, and then returns to the substation. In a grounded-neutral distribution system, there are two paths for returning current: the utility's neutral conductor, or line, or the earth. This latter path exists because the neutral line is intentionally connected to the earth at multiple points — or "grounded" — for both stability and safety. Under normal conditions, most current returns via the utility's neutral line, designed to provide the path of least resistance. Neutral-to-earth voltage, or stray voltage, from a utility arises when there is a voltage difference between the neutral conductor and the surrounding earth, causing current to move between the two. It has been long understood that cows may inadvertently become part of this return path due to environmental conditions, their unique physiology and their frequent contact with components bonded to the grounded-neutral system, such as metal stanchions, feeders, milking equipment or waterers.